James A. Hunter (JH-1910)
HUNTER & KMIEC
255 West 94th Street, No. 10M
New York, New York  10025
Tel:      (646) 666-0122
Fax:      (646) 462-3356
E-Mail: hunter@hunterkmiec.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONNA ANN GABRIELE CHECHELE, | ECF CASE |
| Plaintiff, | |
| – v. – | No. 20-cv-3177 |
| STANDARD GENERAL L.P.,<br>STANDARD GENERAL MASTER FUND L.P.,<br>and SOOHYUNG KIM, | COMPLAINT FOR RECOVERY<br>OF SHORT-SWING PROFIT<br>UNDER 15 U.S.C. § 78p(b) |
| Defendants, | **JURY TRIAL DEMANDED** |
| – and – | |
| TEGNA INC., | |
| Nominal Defendant. | |

        Plaintiff Donna Ann Gabriele Chechele ("Plaintiff"), by her undersigned

attorneys, pleads for her complaint as follows:

**INTRODUCTION**

        1.        This is an action for disgorgement under Section 16(b) of the

Securities Exchange Act of 1934, as amended (the "Act"), 15 U.S.C. § 78p(b).

        2.        Section 16 is the "original and only express 'insider' trading

provision[]" of the Act.  Richard W. Jennings et al., Securities Regulation: Cases and

Materials 1202 (8th ed. 1998).  It works to "prevent[] the unfair use of information that may have been obtained by [an insider] by reason of his relationship to the issuer."  *Id.* § 78p(a).

3.      The statute applies to the directors and officers of every issuer of a class of publicly traded equity securities.  *Id.* § 78p(a), (b).  It also applies to every beneficial owner of more than 10% of any such class.  *Id.*  Under Section 16(b), these "insiders" must disgorge to the issuer any profit they realize from a purchase and sale, or a sale and purchase, of the issuer's equity securities occurring within a period of less than six months.  *Id.* § 78p(b).  If an insider fails to disgorge this "short-swing" profit, the statute empowers the issuer, or "the owner of any security of the issuer," to bring suit to recover it.  *Id.*

4.      Liability under Section 16(b) is strict.  The profit from a short-swing transaction must be disgorged "irrespective of any intention on the part of [the insider] in entering into such transaction."  *Id.*  Recovery never depends on proof of scienter, a breach of duty, or the actual misuse of inside information.  *See Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972).

5.      Plaintiff, a stockholder of Nominal Defendant TEGNA Inc. ("TEGNA"), brings this suit against three affiliated activist investors: the hedge fund Standard General Master Fund L.P., its affiliated adviser Standard General L.P., and their principal Soohyung Kim.  Plaintiff refers to this group collectively as the "Standard General Defendants", or simply "Standard General".

6.      In its efforts to shake up TEGNA's board, Standard General executed a series of transactions in the company's common stock and derivative

securities that unwittingly carried it over the 10% threshold, exposing it to Section 16 of the Act.  Standard General then realized millions of dollars in short-swing profit from its purchase and sale of TEGNA's equity securities.  Under Section 16(b), this profit is now TEGNA's lawful property, which Standard General is strictly liable to account for and repay.

## JURISDICTION AND VENUE

7.     Jurisdiction is conferred on this Court by Section 27 of the Act, 15 U.S.C. § 78aa, and by 28 U.S.C. § 1331.

8.     Venue lies in this District under Section 27 of the Act and 28 U.S.C. § 1401 (a) because Standard General is found in and transacts significant business in this District, maintaining its principal office on Fifth Avenue in midtown Manhattan; and (b) because certain of the transactions giving rise to the liability described herein were executed through the facilities of the New York Stock Exchange LLC, a national securities exchange registered under Section 6 of the Act, 15 U.S.C. § 78f, and located in this District.

## THE PARTIES

### The Parties to This Action

9.     Plaintiff Donna Ann Gabriele Chechele is a natural person, a resident of the State of New Jersey, and a stockholder of TEGNA.

10.     Defendant Standard General Master Fund L.P. (the "Standard General Fund") is a limited partnership formed under the law of the Cayman Islands, with a principal place of business located at 767 Fifth Avenue, 12th Floor, New York, New York 10153.

11.     Defendant Standard General L.P. (the "Standard General Adviser")
is a limited partnership formed under the law of the State of Delaware, with a principal
place of business located at 767 Fifth Avenue, 12th Floor, New York, New York 10153.
The Standard General Adviser serves as the investment manager of the Standard General
Fund.  In that capacity, the Standard General Adviser manages the portfolio of the
Standard General Fund and coordinates purchases and sales of securities among the
Standard General Fund and the Standard General Adviser's other clients.

12.     Defendant Soohyung Kim ("Kim") is a natural person and a
resident of the City of New York.  Kim serves as the Standard General Adviser's chief
executive officer and chief investment officer and is the ultimate decisionmaker for the
Standard General Fund.

13.     Nominal Defendant TEGNA Inc., which Plaintiff refers to as
"TEGNA," is a corporation formed under the law of the State of Delaware with a
principal place of business located at 8350 Broad Street, Tysons, Virginia 22102.  This
action is brought in the right and for the benefit of TEGNA, which is named as a nominal
defendant solely to ensure that all necessary parties are before the Court.

## FACTS

### Standard General's Investment in TEGNA

14.     TEGNA is a publicly held media company with 62 television
stations and four radio stations in 51 U.S. markets.  It was known as Gannett Co., Inc.
until 2015, when it spun off its legacy publishing business and adopted its current name.

15.     Standard General is a hedge fund group with a portfolio heavily
weighted toward media companies.  It has been a TEGNA investor since at least June

2019, when it beneficially owned 6,237,143 shares of TEGNA's common stock, or about 4.10% of shares outstanding.

16.     In August and September 2019, Standard General dramatically increased its TEGNA stake, scooping up nearly 15 million additional shares.

17.     By the start of the new year, Standard General had its eye on TEGNA's board.  It announced in a January 15, 2020 press release that it planned to mount a proxy contest to oust four members of the board and replace them with its own nominees.

18.     The contest was launched on March 30, 2020 with the filing of a definitive proxy statement with the SEC.  The statement disclosed that the Standard General Fund, in its capacity as the record owner of 100 shares of TEGNA's common stock, had nominated four candidates for election to TEGNA's board.

19.     Although the Standard General Fund stood in as the de jure nominator, Kim and the Standard General Adviser have run the campaign in tandem with the fund.  The proxy statement was officially filed by all three Standard General Defendants.  It named Kim as a nominee and disclosed that all three parties are jointly soliciting proxies in his favor and in favor of the other nominees.

20.     When Standard General first announced its intentions back in January, it beneficially owned 21,124,315 shares of TEGNA's common stock, or about 9.74% of shares outstanding.

21.     Not all of this stake took the form of physical shares.  A portion of it was "synthetic," acquired through a type of derivative security known as an equity swap.

22.     Because Standard General's swaps played a significant role in the events that followed, some discussion of their mechanics is necessary.

**The Equity Swaps**

23.     An equity swap is a contract between two parties to exchange, or "swap," the returns on two baskets of assets over a specified term.

24.     In a typical equity swap, one of the baskets contains stock while the other contains an interest-rate product, such as a government bond.  For the duration of the swap's term, the party with the equity "leg" is entitled to receive payments equal to the positive return (price appreciation plus dividends) on the reference stock.

25.     In exchange, the equity party agrees to make payments to the counterparty equal to any negative return on the reference stock.  The equity party must also pay the counterparty regular installments of interest on the fixed-income basket.

26.     Typically, no money changes hands at contract inception.  Instead, the counterparties agree on a starting value, or "notional amount," that is deemed to be invested in each of the two baskets for the term of the contract.  The returns on the two baskets are then compared at regular intervals, with the outperforming party entitled to a single net payment from the other equal to the difference between the two returns.  A final net payment is made at the expiration of the swap.

27.     The equity basket in Standard General's swaps contained TEGNA common stock.  In exchange for making regular interest payments to its counterparty, Standard General enjoyed the risks and rewards of owning TEGNA's common stock.  If the stock outperformed the reference interest-rate product, then the counterparty had to pay Standard General the difference.  If the stock lagged the interest rate, then Standard General had to pay the difference to the counterparty.

28.     Equity swaps can be used as a form of leverage.  They allow a sophisticated party like Standard General to enjoy outsized exposure to a company's stock without actually shelling out to buy the shares.

29.     As of January 15, 2020, for example, Standard General had title to just 19,108,953 of the 21,124,315 TEGNA shares it reported beneficially owning.  The remaining 2,015,362 shares underlay equity swaps.

30.     In effect, Standard General enjoyed the risks and rewards of owning 21,124,315 TEGNA shares even though it had paid for only 19,108,953 of them.

31.     For the activist investor, however, swaps do have a drawback. Because a swap supplies a contractual simulacrum of stock ownership rather than the real McCoy, the investor cannot actually vote the reference shares.  This can be a problem for an activist who needs a lot of stock voted his way to win a proxy contest.

32.     Happily for Standard General, its swaps had a physical settlement option.  The option gave Standard General the right at any time during the term of the swap to settle the contract by paying off the interest and principal on the fixed-income leg and receiving in return the stock underlying the equity leg.

33.     Standard General relied on the physical settlement option to juice its voting power at TEGNA's annual meeting, but the same contract term helped saddle it with a substantial Section 16(b) liability.

**The Pre-Meeting Transactions**

34.     The 2020 annual meeting of TEGNA's stockholders is scheduled to be held on April 30, 2020 at 8:00 a.m. in Tysons, Virginia.

35.     TEGNA's board has fixed March 20, 2020 as the record date for the annual meeting.

36.     All TEGNA stockholders of record at the close of business on March 20, 2020 will be entitled to cast one vote for each share then held of record on each proposal properly presented at the meeting, including the election of TEGNA's directors.

37.     On March 16, 2020, in anticipation of the coming record date, Standard General exercised its contractual right to settle its swaps early and receive delivery of the underlying TEGNA stock.

38.     As a result of the early settlement, Standard General took delivery of 2,015,362 shares of TEGNA's common stock on or about March 18, 2020, just two days before the record date for the annual meeting.

39.     Standard General held those 2,015,362 shares through the close of business on March 20, 2020.

40.     Added to the 19,108,953 shares Standard General already held, those 2,015,362 new shares made Standard General the record owner of 21,124,315 shares of TEGNA's common stock at the close of business on March 20, 2020.

41.     As a result, Standard General will now be entitled to vote all 21,124,315 shares of TEGNA's common stock, or about 9.70% of shares outstanding, at the annual meeting to be held on April 30, 2020.

42.     Standard General's interest in the franchise proved short-lived. Less than a week after the record date, it began dumping millions of shares of TEGNA's common stock, including all the stock it had acquired by settling its swaps just days earlier.

43.     On March 25, 2020, Standard General sold 1,000,000 shares of TEGNA's common stock at a price of $12.5852 per share.

44.     On the same day, Standard General executed a new equity swap agreement referencing 1,000,000 shares of TEGNA's common stock at an initial reference price of $12.60 per share.

45.     Standard General continued unwinding its physical stock position over the next several days, ultimately selling a total of 5,000,000 shares of TEGNA's common stock.  In separate transactions around the same time, it also signed up new swap agreements covering an identical number of shares.  The following paragraphs detail these maneuvers.

46.     On March 26, 2020, Standard General:

(a)     sold 1,000,000 shares of TEGNA's common stock at the price of $13.268 per share; and

(b)     entered into an equity swap referencing 1,000,000 shares of TEGNA's common stock at an initial reference price of $13.2783 per share.

47.     On March 27, 2020, Standard General:

(a)     sold 1,000,000 shares of TEGNA's common stock at the price of $12.9839 per share; and

(b)     entered into an equity swap referencing 1,000,000 shares of TEGNA's common stock at an initial reference price of $12.9914 per share.

48.     On March 30, 2020, Standard General:

(a)     sold 1,000,000 shares of TEGNA's common stock at the price of $10.5788 per share; and

(b)      entered into an equity swap referencing 1,000,000 shares of

TEGNA's common stock at an initial reference price of $10.5883 per share.

49.      On March 31, 2020, Standard General:

(a)      sold 1,000,000 shares of TEGNA's common stock at the

price of $10.8205 per share; and

(b)      entered into an equity swap referencing 1,000,000 shares of

TEGNA's common stock at an initial reference price of $10.8248 per share.

50.      Although Standard General entered into each new swap fast on the

heels of a stock sale, the two transactions were executed separately and independently of

one another, and at slightly different times.

51.      That the stock and swap transactions were not coupled together is

evident from the price difference between them.  To take just one example, Standard

General locked in a purchase price of $13.2783 on the swap it signed up on March 26,

2020, while the stock sale it executed that same day went off at a slightly lower price of

$13.268 per share.

52.      Standard General's quick pivot on the stock did not escape the

notice of TEGNA's board.  On April 1, 2020, the same day Standard General disclosed

the transactions described in paragraphs 42-49 above, TEGNA put out a press release

pointing its investors to the 5,000,000 jettisoned shares.  The press release read in

pertinent part:

> Today's Schedule 13-D amendment filing by Standard General
> should be troubling for all TEGNA shareholders.  Just one day
> after describing itself in a letter to shareholders as 'the largest
> active shareholder of TEGNA' with a 9.7% ownership position,
> Standard General today disclosed that it sold approximately 25%
> of its shares shortly after the record date and instead took

> derivative positions.  This reduced its stock ownership position
> while likely retaining its ability to vote all of the shares it held
> prior to those recent sales at TEGNA's upcoming annual meeting.
> None of this information was communicated in yesterday's letter,
> and we urge shareholders to look at the Schedule 13-D amendment
> for themselves.

53.     Wincing in the spotlight, Standard General made its second about-face in as many weeks.  The day after the press release hit, Standard General made a display of buying back most of the 5,000,000 shares it had sold just days earlier.

54.     The repurchase was accomplished in a single block trade on April 2, 2020, when Standard General bought 4,591,164 shares of TEGNA's common stock at a price of $11.075 per share.

55.     Table 1 summarizes Standard General's transactions in TEGNA's common stock in March and April 2020:

| Date | Type of Transaction | Number of Shares | Price per Share |
|---|---|---|---|
| 03/18/20 | Acquisition of stock upon settlement of swap | 2,015,362 | N/A |
| 03/25/20 | Sale of stock | (1,000,000) | $12.5852 |
| 03/25/20 | Entry into swap | 1,000,000 | $12.6000 |
| *03/26/20* | *Sale of stock* | *(1,000,000)* | *$13.2680* |
| *03/26/20* | *Entry into swap* | *1,000,000* | *$13.2783* |
| *03/27/20* | *Sale of stock* | *(1,000,000)* | *$12.9839* |
| *03/27/20* | *Entry into swap* | *1,000,000* | *$12.9914* |
| *03/30/20* | *Sale of stock* | *(1,000,000)* | *$10.5788* |
| *03/30/20* | *Entry into swap* | *1,000,000* | *$10.5883* |

| 03/31/20 | *Sale of stock* | *(1,000,000)* | *$10.8205* |
| 03/31/20 | *Entry into swap* | *1,000,000* | *$10.8248* |
| 04/02/20 | *Purchase of stock* | *4,591,164* | *$11.0750* |

Table 1.  Standard General's transactions in TEGNA's common stock and derivative securities in March and April 2020.  Each swap can be physically settled at any time at Standard General's option. Transactions in *italics* are subject to Section 16(b).

56.     As will be seen, all of Standard General's transactions after March 25, 2020 (i.e., the ones in *italics* in Table 1 above) were subject to Section 16(b).

**The Section 16(b) Liability**

57.     For purposes of Section 13(d) of the Act, a person beneficially owns stock if he has or shares, directly or indirectly, (a) the power to vote the stock or (b) the power to dispose of the stock.  *See* Rule 13d-3(a), 17 C.F.R. § 240.13d-3(a).

58.     In addition, a person is deemed to beneficially own stock if, while lacking the instant power to vote or dispose of the stock, he has the right to acquire that power within 60 days.  *See id.* § 240.13d-3(d)(1)(i) ("A person shall be deemed to be the beneficial owner of a security . . . if that person has the right to acquire beneficial ownership of such security, as defined in Rule 13d-3(a) (§ 240.13d-3(a)) within sixty days . . . .").

59.     Section 16 relies on the same beneficial ownership rules for purposes of determining those persons subject to the statute as the beneficial owners of more than 10% of a class of registered equity securities.  *See* Rule 16a-1(a)(1), 17 C.F.R. § 240.16a-1(a)(1) ("Solely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities registered pursuant to

section 12 of the Act, the term 'beneficial owner' shall mean any person who is deemed a beneficial owner pursuant to section 13(d) of the Act and the rules thereunder . . . .").

60.     Under these rules, Standard General beneficially owned the TEGNA stock in its portfolio because it had the power to vote and sell the stock.

61.     But Standard General also beneficially owned the TEGNA stock underlying its equity swaps, because the swaps had physical settlement options that allowed Standard General, at any time, to take delivery of the underlying shares and thereby acquire voting and dispositive power over them.

62.     The swaps' physical settlement terms are known because Standard General disclosed them on statements filed with the SEC on Schedule 13D on September 30, 2019, January 15, 2020, and March 18, 2020, and on a statement filed with the SEC on Form 3 on April 7, 2020.

63.     In the case of the swaps held prior to March 16, 2020, the physical settlement option is also known because Standard General actually exercised the option by taking delivery of the underlying shares on March 18, 2020 as described earlier.

64.     Standard General has taken the view that its transactions between March 25 and March 31, 2020 — selling 5,000,000 shares of TEGNA's common stock and signing up swaps on a like number of shares — had no net effect on its beneficial ownership.

65.     In a statement filed with the SEC on Schedule 13D on April 1, 2020, for example, Standard General reported no change in the number of shares beneficially owned from the last statement filed on March 18, 2020.

66. Standard General's view is incorrect, and the beneficial ownership numbers disclosed in its statements filed with the SEC after March 18, 2020 are materially false.

67. Standard General's view is incorrect, and its disclosure false, because the sales between March 25, 2020 and March 31, 2020 did not divest it of beneficial ownership of the 5,000,000 shares sold.

68. Standard General still beneficially owns the 5,000,000 shares it sold between March 25, 2020 and March 31, 2020 because it retains the power to vote them at TEGNA's annual meeting, having held them through the record date of March 20, 2020.

69. Standard General's vestigial power to vote the 5,000,000 shares sold between March 25, 2020 and March 31, 2020 will not be extinguished until the conclusion of TEGNA's annual meeting on April 30, 2020. *See, e.g.*, Exchange Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting Compliance & Disclosure Interpretation No. 104.07 (Sept. 24, 2009) ("[V]oting power is not extinguished until the conclusion of the meeting . . . ."), *available at* https://www.sec.gov/divisions/corpfin/guidance/reg13d-interp.htm.

70. Until then, Standard General must include those 5,000,000 shares in every calculation of its beneficial ownership. *See id.* ("The security holder should not file the final amendment on Schedule 13D until the end of the shareholder meeting."); *see also* Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide 146 n.170 (4th ed. 2012) ("If the sale [i.e., a sale after the record date] brings the seller's ownership

below 10 percent of the class, the seller will remain a ten percent owner through the stockholder meeting.").

71.     But even though Standard General's sales between March 25, 2020 and March 31, 2020 had no effect on its beneficial ownership, the new swaps it acquired during that time did.  Each swap boosted its beneficial ownership by 1,000,000 shares because the swap could be physically settled at Standard General's option, giving it the immediate right to acquire voting or dispositive power over the underlying stock.

72.     Standard General's transactions between March 25, 2020 and March 31, 2020 thus had a ratchet effect on its beneficial ownership.  The stock sales made no difference in the number of shares it beneficially owned, while every new swap accounted for beneficial ownership of 1,000,000 additional shares.

73.     It follows that Standard General's transactions on March 25, 2020 left it with beneficial ownership of a total of 22,124,315 shares of TEGNA's common stock.  That number includes both the 21,124,315 shares Standard General held on the March 20 record date (and therefore had the lingering power to vote) *plus* the 1,000,000 new shares it had the right to acquire under the March 25 swap.

74.     As of March 20, 2020, TEGNA had 218,352,668 shares of common stock outstanding, and that number has not changed materially since then.

75.     It now takes but simple arithmetic to show that, at the close of March 25, 2020, Standard General was a beneficial owner of $22,124,315 \div 218,352,668 \approx$ 10.13% of TEGNA's outstanding common stock.

76.     Standard General has remained a beneficial owner of more than 10% of TEGNA's common stock at all times since March 25, 2020 and, as such, has

been subject to Section 16(b) of the Act with respect to its transactions in TEGNA's equity securities.  *See* Romeo & Dye, *supra*, 146 n.170 ("[T]he insider . . . will be required to report on Form 4 (and will be subject to potential Section 16(b) liability for) any additional trades that occur prior to the meeting of stockholders.").

77.     Those transactions include its sales of TEGNA common stock between March 26, 2020 and March 31, 2020, as well as its backtrack repurchase of the stock on April 2, 2020.

78.     But Section 16(b) also reaches the new swap agreements Standard General signed up between March 26, 2020 and March 31, 2020.

79.     Those swaps are "derivative securities" for purposes of Section 16. *See* Rule 16a-1(c), 17 C.F.R. § 240.16a-1(c).  They give Standard General a "call equivalent position" in TEGNA's common stock because their value tends to increase with the stock price.  *See id.* § 240.16a-1(b).

80.     Each time Standard General established a call equivalent position by executing a new swap, it was deemed to have purchased the underlying stock for purposes of Section 16(b).  *See* Rule 16b-6(a), 17 C.F.R. § 240.16b-6(a) ("The establishment of or increase in a call equivalent position . . . shall be deemed a purchase of the underlying security for purposes of section 16(b) of the Act . . . .").

81.     The deemed purchase price was supplied by the contemporaneous market price of TEGNA's common stock, which also served as the initial reference price for each swap.  *See id.* § 240.16b-6(c)(2).

82.     In other words, each swap signed up between March 26, 2020 and March 31, 2020 was treated as a stock purchase, "matchable" under Section 16(b) at its initial reference price with Standard General's stock sales during the same period.

83.     The stock sales are also matchable under Section 16(b) with Standard General's stock purchase on April 2, 2020.

84.     Table 2 summarizes the Section 16(b) treatment of the transactions for which Standard General must bear liability:

| Date | Section 16(b) Transaction | Number of Shares | Price per Share |
|---|---|---|---|
| 03/26/20 | Sale | (1,000,000) | $13.2680 |
| 03/26/20 | Purchase | 1,000,000 | $13.2783 |
| 03/27/20 | Sale | (1,000,000) | $12.9839 |
| 03/27/20 | Purchase | 1,000,000 | $12.9914 |
| 03/30/20 | Sale | (1,000,000) | $10.5788 |
| 03/30/20 | Purchase | 1,000,000 | $10.5883 |
| 03/31/20 | Sale | (1,000,000) | $10.8205 |
| 03/31/20 | Purchase | 1,000,000 | $10.8248 |
| 04/02/20 | Purchase | 4,591,164 | $11.0750 |

Table 2.  Section 16(b) treatment of Standard General's transactions
in TEGNA's common stock and equity swaps.

### Standard General's Pecuniary Interest

85.     Standard General's advisory clients, including the Standard General Fund, have agreed to coordinate trading for their accounts through the Standard General Adviser and, in his capacity as the adviser's chief investment officer, Kim.

86.     The Standard General Adviser executes all transactions for its clients in gross according to Kim's instructions.

87.     The Standard General Adviser then allocates securities purchased and sold among the Standard General Fund and its other clients according to agreed allocation formulas and strategies.

88.     Although Standard General does not voluntarily disclose these allocations, it is required in some cases to make limited disclosure.  That disclosure suggests that the Standard General Fund has a significant pecuniary interest in Standard General's transactions between March 26, 2020 and April 2, 2020.

89.     The definitive proxy statement Standard General filed with the SEC on March 30, 2020 discloses partial allocations for Standard General's transactions on March 25, 26, and 27, 2020.

90.     According to that disclosure, 291,490 of the 1,000,000 shares of TEGNA's common stock sold on each of those days were allocated to the account of the Standard General Fund.

91.     The same filing discloses that 291,490 of the 1,000,000 shares underlying the swaps acquired on each of those days were allocated to the account of the Standard General Fund.

92.     Based on those numbers alone, the Standard General Fund realized a short-swing profit of more than $80,000.

93.     If the same proportional allocations hold for the transactions executed on March 30 and 31, 2020, then the Standard General Fund realized a short-swing profit of more than $781,000.

94.     But Kim and the Standard General Adviser must also have some pecuniary interest in the transactions executed between March 26, 2020 and April 2, 2020.  It is de rigueur in the hedge fund industry for an adviser and its principals to receive a "carry" or other performance compensation equal to a percentage of any positive return realized on their clients' investments.  The extent of this performance compensation depends on the fund and adviser but has historically been on the order of 20% of the fund's positive return.

95.     Kim and the Standard General Adviser are also likely to own limited partnership interests in the adviser's fund clients, including the Standard General Fund.  Some limited partnership stake is likely because fund investors have historically insisted that a fund's managers and principals maintain "skin in the game" by investing alongside them.  Because the purpose of this arrangement is to align the interests of the fund's investors and managers, it would be implausible for Kim and the Standard General Adviser to have no interest in the investments they manage.

96.     There may be other Standard General funds that have realized a short-swing profit through the transactions executed by Kim and the Standard General Adviser between March 26, 2020 and April 2, 2020.  Discovery will be required to identify these funds, and this complaint may be amended to name additional funds as defendants.

97.     Assuming that each Standard General fund had the same proportional interest in all of the transactions executed between March 26, 2020 and April 2, 2020, then TEGNA would be entitled to recover a total of $4,840,000.00 from the transactions alleged herein.

**Plaintiff's Demand**

98.     By her counsel's letter of April 2, 2020, Plaintiff made demand on

TEGNA for recovery of the short-swing profit realized by Standard General from its

transactions in TEGNA's common stock and derivative securities.

99.     TEGNA declined the demand by letter of April 14, 2020.

TEGNA's response advised Plaintiff's counsel that "the Company does not intend to

pursue a Section 16(b) claim against Standard General relating to the Transactions."

100.     Further delay would be a futile gesture, TEGNA having declined

prosecution of the matter in unequivocal terms.

**SOLE CLAIM FOR RELIEF:**
**DISGORGEMENT UNDER 15 U.S.C. § 78p(b)**
**(AGAINST ALL STANDARD GENERAL DEFENDANTS)**

101.     Plaintiff realleges and incorporates by reference the allegations in

paragraphs 1-100 above.

102.     Section 16(b) of the Securities Exchange Act of 1934, as amended,

reads in pertinent part as follows:

> For the purpose of preventing the unfair use of information which
> may have been obtained by [a 10 percent] beneficial owner,
> director, or officer by reason of his relationship to the issuer, any
> profit realized by him from any purchase and sale, or any sale and
> purchase, of any equity security of such issuer (other than an
> exempted security) or a security-based swap agreement involving
> any such equity security within any period of less than six months,
> unless such security or security-based swap agreement was
> acquired in good faith in connection with a debt previously
> contracted, shall inure to and be recoverable by the issuer,
> irrespective of any intention on the part of such beneficial owner,
> director, or officer in entering into such transaction of holding the
> security or security-based swap agreement purchased or of not
> repurchasing the security or security-based swap agreement sold
> for a period exceeding six months.  Suit to recover such profit may
> be instituted at law or in equity in any court of competent

> jurisdiction by the issuer, or by the owner of any security of the
> issuer in the name and in behalf of the issuer if the issuer shall fail
> or refuse to bring such suit within sixty days after request or shall
> fail diligently to prosecute the same thereafter; but no such suit
> shall be brought more than two years after the date such profit was
> realized.

15 U.S.C. § 78p(b).

103.    At all times on and since March 26, 2020, each Standard General Defendant has beneficially owned more than 10% of TEGNA's outstanding common stock and, accordingly, has been subject to Section 16 of the Act.

104.    While subject to Section 16 of the Act, the Standard General Defendants purchased TEGNA's common stock or call equivalent derivative securities as further described herein.

105.    While subject to Section 16 of the Act, the Standard General Defendants sold TEGNA's common stock as further described herein.

106.    The sales described in paragraph 105 above occurred within less than six months of the purchases described in paragraph 104 above.

107.    Certain of the sales described in paragraph 105 above occurred at higher prices than certain of the purchases described in paragraph 104 above.

108.    Each Standard General Defendant had a direct or indirect pecuniary interest in some or all of TEGNA's common stock and derivative securities purchased and sold as described in paragraphs 104-105 above.

109.    Under the "lowest-in, highest-out" method for computing realized profit pursuant to Section 16(b) of the Act, the Standard General Defendants realized a profit of as much as $4,840,000.00 from the transactions described in paragraphs 104-105 above, the exact amount of such profit being determinable only after discovery and trial.

110.    Under Section 16(b) of the Act, the profit realized by the Standard General Defendants as described in paragraph 109 above inured to TEGNA and remains TEGNA's lawful property, recoverable by Plaintiff in its stead, TEGNA having unequivocally declined to seek recovery of the same despite Plaintiff's due and timely demand.

### DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury on all questions so triable.

[*prayer for relief follows on next page*]

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays this Court for judgment:

(a)     Requiring the Standard General Defendants to account for and pay over to

TEGNA the short-swing profit realized and retained by each of them in

violation of Section 16(b) of the Act in a total amount not less than

$4,840,000.00, together with appropriate pre- and post-judgment interest

and the costs of this suit;

(b)     Awarding Plaintiff her costs and disbursements including reasonable

attorney's, accountant's, and expert witness fees; and

(c)     Granting Plaintiff such further relief as the Court deems just and proper.


Dated: April 22, 2020
       New York, New York

                              HUNTER & KMIEC

                              By: _____

                              James A. Hunter
                              255 West 94th Street, No. 10M
                              New York, New York  10025
                              Tel:     (646) 666-0122
                              Fax:     (646) 462-3356
                              E-Mail:  hunter@hunterkmiec.com

                              *Attorneys for Plaintiff*