UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DONNA ANN GABRIELE CHECHELE,

                              Plaintiff,

                    -v.-

STANDARD GENERAL L.P.; STANDARD
GENERAL MASTER FUND L.P.; and
SOOHYUNG KIM,

                              Defendants,

TEGNA, INC.,

                              Nominal Defendant.

20 Civ. 3177 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Donna Ann Gabriele Chechele brings this action pursuant to

Section 16(b) of the Securities Exchange Act of 1934, as amended (the

"Exchange Act"), 15 U.S.C. § 78p(b), on behalf of nominal defendant TEGNA,

Inc. ("TEGNA").  Plaintiff is a stockholder of TEGNA, and alleges that

Defendants Standard General L.P. ("Standard General"), Standard General

Master Fund L.P. (the "Standard General Master Fund"), and Soohyung Kim

(collectively with Standard General and the Standard General Master Fund,

"Defendants"), violated the short-swing profits provision of Section 16(b) by

engaging in purchases and sales of TEGNA's common stock within a six-month

period.  Plaintiff seeks disgorgement of any short-swing profits realized by

Defendants for the benefit of TEGNA.  Defendants now move to dismiss the

Amended Complaint for failure to state a claim pursuant to Federal Rule of

Civil Procedure 12(b)(6). For the reasons that follow, Defendants' motion to dismiss is denied.

**BACKGROUND**[1]

**A. Factual Background**

**1. The Parties**

Standard General is an investment adviser registered with the SEC. (FAC ¶ 26). Among other things, Standard General creates funds, including the Standard General Master Fund, to manage the capital of institutions and high-net-worth individuals. (*Id.*). Standard General serves as the investment manager of the Standard General Master Fund, and in that capacity, invests the Fund's capital according to stipulated investment objectives. (*Id.* at ¶¶ 11, 26). Soohyung Kim is Standard General's managing partner, chief executive officer, and chief investment officer. (*Id.* at ¶ 12). Plaintiff alleges that Kim is the Standard General Master Fund's "ultimate decisionmaker." (*Id.* at ¶¶ 12, 27-30). Both Plaintiff and Standard General own securities in TEGNA, a publicly held media company. (*Id.* at ¶¶ 9, 14-15).

---

[1]    The facts in this Opinion are drawn primarily from Plaintiff's Amended Complaint ("Amended Complaint" or "FAC" (Dkt. #23)), which is the operative pleading in this case, along with the Declaration of Rebecca L. Martin submitted in support of Defendants' motion to dismiss ("Martin Declaration" or "Martin Decl." (Dkt. #27)) and certain exhibits appended thereto. In particular, the Court considers exhibits appended to the Martin Declaration that consist of documents publicly filed with the United States Securities and Exchange Commission (the "SEC"). *See Tongue* v. *Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) ("The Court may [ ] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." (citation and internal quotation marks omitted)); *see also* Discussion Sec. A.1.

For ease of reference, the Court refers to Defendants' opening brief as "Def. Br." (Dkt. #26); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #28); and Defendants' reply brief as "Def. Reply" (Dkt. #30).

## 2. The Proxy Battle and Standard General's Pre-Annual Meeting Transactions

On January 15, 2020, Standard General issued a press release announcing its nomination of four candidates — including Defendant Kim — for election to TEGNA's Board of Directors. (FAC ¶¶ 40, 52). Standard General proceeded to launch a proxy contest for its candidates' election on March 13, 2020, by filing a preliminary proxy statement with the SEC. (*Id.* at ¶ 49). The election was to take place at TEGNA's annual meeting scheduled for April 30, 2020. (*Id.* at ¶¶ 82, 84). On March 25, 2020, TEGNA's Board of Directors announced that March 20, 2020, had been set as the record date for determining the shareholders entitled to vote at the annual meeting (the "Record Date"). (*Id.* at ¶ 83; *see also* Martin Decl., Ex. 7 at 4 (March 25, 2020 Notice of Annual Meeting of Shareholders)). As a result, holders of TEGNA stock at the close of business on March 20, 2020, were entitled to cast one vote per share on each proposal properly presented at the annual meeting, including the election of TEGNA's directors. (FAC ¶ 84).

As of January 15, 2020, Standard General was a beneficial owner of about 9.7% of TEGNA's common stock. (FAC ¶ 16). Of the 21,124,315 shares of TEGNA stock Standard General held at this time, 19,108,953 were physical shares. (*Id.* at ¶ 77). The remaining 2,015,362 shares took the form of equity swap transactions with various counterparties. (*Id.* at ¶ 77; *see also id.* at ¶¶ 70-76 (discussing equity swaps)). The swaps included a physical settlement option, pursuant to which Standard General had the right at any time to settle

the swaps by paying off the interest and principal owed to its counterparties and receiving in return the underlying physical shares. (*Id.* at ¶ 80).

On March 16, 2020, Standard General exercised its contractual right to settle its equity swap transactions and receive delivery of the underlying TEGNA stock. (FAC ¶ 86). Pursuant to this settlement, Standard General received 2,015,362 additional shares of TEGNA's common stock on or about March 18, 2020. (*Id.* at ¶ 87). As a result, as of the Record Date of March 20, 2020, Standard General had the right to direct how 21,124,315 physical shares of TEGNA's common stock — or about 9.7% of TEGNA's outstanding shares — would be voted at the annual meeting. (*Id.* at ¶ 90).

Beginning on March 25, 2020 (perhaps coincidentally, the date on which TEGNA's board announced the Record Date), Standard General began unwinding its physical stock position. (FAC ¶¶ 92, 94). On five successive business days between March 25 and March 31, 2020, Standard General both sold 1,000,000 shares of TEGNA stock and separately entered into new equity swap agreements covering an identical number of shares (the "Post-Record Date Transactions"). (*Id.* at ¶¶ 95-98). Standard General ultimately sold a total of 5,000,000 shares of TEGNA stock and entered into swap agreements that could be settled in kind for the exact same number of shares sold. (*Id.* at ¶ 94).

Following a press release issued by TEGNA on April 1, 2020, regarding the reductions in Standard General's stock position (FAC ¶ 101), Standard General repurchased 4,591,164 shares of TEGNA stock in a single block trade

(*id.* at ¶¶ 102-103). Standard General's March and April 2020 transactions are summarized below.

| Date | Type of Transaction | Number of Shares | Price per Share |
|---|---|---|---|
| 03/18/20 | Acquisition of stock upon settlement of swap | 2,015,362 | N/A |
| 03/25/20 | Sale of stock | (1,000,000) | $12.5852 |
| 03/25/20 | Entry into swap | 1,000,000 | $12.6000 |
| 03/26/20 | Sale of stock | (1,000,000) | $13.2680 |
| 03/26/20 | Entry into swap | 1,000,000 | $13.2783 |
| 03/27/20 | Sale of stock | (1,000,000) | $12.9839 |
| 03/27/20 | Entry into swap | 1,000,000 | $12.9914 |
| 03/30/20 | Sale of stock | (1,000,000) | $10.5788 |
| 03/30/20 | Entry into swap | 1,000,000 | $10.5883 |
| 03/31/20 | Sale of stock | (1,000,000) | $10.8205 |
| 03/31/20 | Entry into swap | 1,000,000 | $10.8248 |
| 04/02/20 | Purchase of stock | 4,591,164 | $11.0750 |

(*Id.* at ¶ 104 (Table 1)).

### 3. Plaintiff's Demand and TEGNA's Annual Meeting

On April 2, 2020, Plaintiff's counsel sent a demand letter to TEGNA on Plaintiff's behalf, requesting recovery of Standard General's "short-swing profit" realized from its transactions in TEGNA's common stock and derivative securities. (FAC ¶ 147). In an April 14, 2020 letter response, TEGNA informed Plaintiff that it declined to pursue a Section 16(b) claim against Standard General. (*Id.* at ¶ 148).

TEGNA's annual meeting was held as scheduled on April 30, 2020 (the "Annual Meeting"). (FAC ¶ 150). At the meeting, Standard General voted all 21,124,315 of its shares in favor of its preferred slate of nominees for the Board

of Directors.  (*Id.* at ¶ 151).  Despite Standard General's efforts, TEGNA's stockholders reelected all 12 incumbent directors.  (*Id.* at ¶ 152).

## B.    Procedural Background

On April 22, 2020, Plaintiff commenced this action with the filing of her Complaint.  (Dkt. #1).  On June 5, 2020, Defendants filed a letter requesting a pre-motion conference to discuss their anticipated motion to dismiss the Complaint (Dkt. #15), which request Plaintiff opposed (Dkt. #16).  Following a pre-motion conference on July 30, 2020 (Minute Entry for July 30, 2020), Defendants filed their initial motion to dismiss the Complaint (Dkt. #20-22).  Plaintiff responded with the filing of her Amended Complaint on September 11, 2020.  (Dkt. #23).  The Court denied Defendants' motion as moot, and set a schedule for briefing on a renewed motion to dismiss.  (Dkt. #24).

Pursuant to the Court's scheduling order, Defendants filed their motion to dismiss the Amended Complaint and supporting papers on October 12, 2020.  (Dkt. #25-27).  Plaintiff filed her opposition brief and supporting papers on November 9, 2020 (Dkt. #28-29), and Defendants filed their reply brief and request for oral argument on November 23, 2020 (Dkt. #30, 31).[2]  On May 10, 2021, Defendants submitted a notice of supplemental authority (Dkt. #32), to which Plaintiff responded on May 13, 2021 (Dkt. #33).  In an Order issued on May 14, 2021, the Court indicated that briefing on this issue was closed.  (Dkt. #34).  As such, the motion is fully briefed and ripe for review.

---

[2]    While the Court appreciated Defendants' willingness to appear before the Court, it determined that oral argument was not necessary to resolve the instant motion.

## DISCUSSION

**A.**   **Applicable Law**

   **1.**   **Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)**

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). A complaint that contains only "naked assertions" or "a formulaic recitation of the elements of a cause of action" does not suffice. *Twombly*, 550 U.S. at 555. The Court must accept as true all well-pleaded factual allegations in the complaint. *See Iqbal*, 556 U.S. at 678.

In making Rule 12(b)(6) determinations, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference ... and documents possessed by or known to the plaintiff and upon which [she] relied in bringing the suit." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *accord Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d

147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).

## 2.    Violations of Section 16(b)

Section 16(b) of the Exchange Act is an insider-trading statute that requires statutorily defined corporate insiders to disgorge short-swing profits obtained by trading in the securities of the corporation. *Olagues* v. *Perceptive Advisors LLC*, 902 F.3d 121, 125 (2d Cir. 2018).[3] It states in relevant part:

> For the purpose of preventing the unfair use of information which may have been obtained by [a corporate insider] by reason of his relationship to the issuer, any profit realized by [the insider] from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of [the insider].

15 U.S.C. § 78p(b).  The Second Circuit has made plain that Section 16(b), "a vital component of the Exchange Act, [] was designed to prevent an issuer's directors, officers, and principal stockholders from engaging in speculative transactions on the basis of information not available to others." *Donoghue* v. *Bulldog Inv'rs Gen. P'ship*, 696 F.3d 170, 173-74 (2d Cir. 2012) (citation  and internal quotation marks omitted).

As indicated by the "irrespective of any intention" clause, Section 16(b) "requires the inside, short-swing trader to disgorge all profits realized on all 'purchases' and 'sales' within the [six-month] period, without proof of actual

---

[3]    Because many Section 16(b) lawsuits are brought by a small number of plaintiffs, the Court will use the name of the defendant in the short form of certain citations to avoid confusion.

abuse of insider information, and without proof of intent to profit on the basis of such information." *Roth* v. *Jennings*, 489 F.3d 499, 507 (2d Cir. 2007) (quoting *Kern Cty. Land Co.* v. *Occidental Petroleum Corp.*, 411 U.S. 582, 595 (1973)); *see also, e.g.*, *Foremost-McKesson, Inc.* v. *Provident Sec. Co.*, 423 U.S. 232, 251 (1976) ("Section 16(b) imposes a strict prophylactic rule with respect to insider, short-swing trading."). Thus, Section 16(b) operates as a "blunt instrument" to impose a form of strict liability, requiring no showing of actual misuse of inside information or unlawful intent. *Bulldog Inv'rs*, 696 F.3d at 174 (citations omitted).

To state a claim under Section 16(b), a plaintiff must plausibly allege: (i) a purchase and (ii) a sale of securities (iii) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (iv) within a six-month period. *Perceptive Advisors*, 902 F.3d at 125; *see also Chechele* v. *Sperling*, 758 F.3d 463, 467 (2d Cir. 2014); *Feder* v. *Frost*, 220 F.3d 29, 32 (2d Cir. 2000). "The statutory definitions of 'purchase' and 'sale' are broad and, at least arguably, reach many transactions not ordinarily deemed a sale or purchase." *Kern Cty.*, 411 U.S. at 593-94.

## B.    Analysis

Plaintiff alleges that as of the close of business on the Record Date, Defendants held 21,124,315 shares of TEGNA's common stock, or about 9.7% of the company's outstanding shares. (FAC ¶¶ 89-90). Although Defendants proceeded to sell 5,000,000 of these shares between March 25, 2020, and March 31, 2020, Plaintiff alleges that Defendants nonetheless maintained

9

vestigial voting power over these 5,000,000 shares — and thus "beneficial ownership" over the shares — through the conclusion of the Annual Meeting. (*Id.* at ¶ 115). Moreover, Defendants increased their beneficial ownership by entering into swap transactions between March 25, 2020, and March 31, 2020, each of which gave them beneficial ownership over an additional 1,000,000 shares of TEGNA stock. (*Id.* at ¶ 117). In particular, Defendants' stock sale and swap transactions on March 25, 2020, left them with beneficial ownership over 22,124,315 shares — or 10.13% of TEGNA's common stock. (*Id.* at ¶¶ 119-121). Plaintiff concludes that Defendants' remaining Post-Record Date Transactions were subject to Section 16(b), as Defendants engaged in those transactions as beneficial owners of more than 10% of TEGNA's common stock. (*Id.* at ¶¶ 122-124).

Defendants disagree with Plaintiff's theory of liability, and have put forth several arguments in favor of dismissal of the Amended Complaint. Those arguments include: (i) Defendants are not "statutory insiders" subject to liability under Section 16(b) (Def. Br. 10-16); (ii) Defendants' Post-Record Date Transactions fall within SEC exemptions to Section 16(b) (*id.* at 16-24); (iii) Plaintiff is barred from seeking a disgorgement award that exceeds Defendants' actual gains from the transactions (*id.* at 24); and (iv) Plaintiff's proposed application of Section 16(b) is inconsistent with its legislative purpose (*id.* at 25). The Court will take each argument in turn, but to preview, finds that none of Defendants' proffered grounds compels dismissal.

### 1. Plaintiff Has Plausibly Alleged That Defendants Were Statutory "Insiders"

As noted above, to state a claim under Section 16(b), a plaintiff must plausibly allege: (i) a purchase and (ii) a sale of securities (iii) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (iv) within a six-month period. *Perceptive Advisors*, 902 F.3d at 125. Under Section 16(b), a stock purchaser who acquires a 10% beneficial ownership stake in an issuer "becomes a corporate insider and thereby accepts 'the limitation' that attaches to his fiduciary status: not to engage in any short-swing trading in the issuer's stock." *Bulldog Inv'rs*, 696 F.3d at 177 (alteration and citation omitted); *see also* 15 U.S.C. § 78p(a) (requiring disclosure of "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security (other than an exempted security)").

Plaintiff alleges that Defendants became beneficial owners of more than 10% of TEGNA's common stock over the course of their Post-Record Date Transactions. (FAC ¶ 121 ("It now takes but simple arithmetic to show that, at the close of March 25, 2020, the Standard General Defendants were the beneficial owners of ... 10.13% of TEGNA's outstanding common stock.")). Defendants argue that they remained under the 10% threshold throughout the Post-Record Date Transactions, and that they thus do not meet the statutory definition of an "insider." (Def. Br. 10-16).

While the Exchange Act does not itself define the term "beneficial owner," *Feder*, 220 F.3d at 32 (2d Cir. 2000), the SEC has promulgated definitional

rules under Section 16.  For the purpose of identifying statutory insiders, the
SEC has "adopt[ed] the definition of beneficial owner that governs under
§ 13(d)" of the Exchange Act.  *Rubenstein* v. *Int'l Value Advisers, LLC*, 363 F.
Supp. 3d 379, 389 (S.D.N.Y. 2019) (quoting *Egghead.Com, Inc.* v. *Brookhaven
Cap. Mgmt. Co.*, 340 F.3d 79, 84 (2d Cir. 2003)), *aff'd*, 959 F.3d 541 (2d Cir.
2020); *see also* 17 C.F.R. § 240.16a-1(a)(1) (defining "beneficial owner" as "any
person who is deemed a beneficial owner pursuant to section 13(d) of the Act
and the rules thereunder").  Certain classes of securities holders are then
exempted from the definition.  *See* 17 C.F.R. § 240.16a-1(a)(1).

Under Rule 13d-3, a beneficial owner "includes any person who, directly
or indirectly, … has or shares: [i] Voting power which includes the power to
vote, or to direct the voting of, such security; and/or, [ii] Investment power
which includes the power to dispose, or to direct the disposition of, such
security." 17 C.F.R. § 240.13d-3(a).  In line with this rule, Plaintiff's theory of
liability begins with the incontestable premise that Defendants were beneficial
owners of any TEGNA stock over which they had or shared voting or dispositive
power.  (*See* FAC ¶ 106).

Plaintiff argues that while Defendants sold 5,000,000 shares of TEGNA
stock between March 25 and March 31, 2020, given that the stock was in their
possession as of the March 20, 2020 Record Date, they maintained voting
power over the shares for the purposes of TEGNA's annual meeting.  (FAC
¶¶ 114-15).  Defendants thus remained the sold shares' beneficial owners
through the conclusion of the Annual Meeting.  (*Id.*).  But while the stock sales

between March 25 and March 31, 2020, had no effect on Defendants' beneficial ownership, "the same is not true" of the swap transactions they entered into on those dates. (*Id.* at ¶ 117). That is, "[e]ach new swap boosted Standard General's beneficial ownership by 1,000,000 shares because the physical settlement option gave Standard General the right to acquire voting and dispositive power over those shares at any time." (*Id.*). Plaintiff concludes:

> The transactions between March 25, 2020 and March 31, 2020 thus had a ratchet effect on Standard General's beneficial ownership. The stock sales made no dent in the number of shares the Standard General Defendants beneficially owned, while each new swap gave them beneficial ownership of 1,000,000 additional shares.

(*Id.* at ¶ 118). Taking into account the additional shares acquired through these swap transactions, and assuming Defendants maintained beneficial ownership over the sold shares of common stock, "at the close of March 25, 2020," Defendants were the beneficial owners of 10.13% of TEGNA's outstanding common stock, or 22,124,315 shares. (*Id.*).

In their briefing, Defendants argue that they remained below the 10% threshold over the course of March 25 to March 31, 2020, as each of their swap transactions on those days was preceded by the sale of 1,000,000 shares. (Def. Br. 12).[4] They refer the Court to the Supreme Court's determination in

---

[4] Defendants do not appear to contest their beneficial ownership of TEGNA shares acquired through equity swap transactions. (*See* Def. Br. 5 ("Because Standard General had the option to settle the swaps 'in kind' for physical shares, the TEGNA shares referenced by the swaps were reported as beneficially owned by Standard General." (citations omitted)); *see also id.* at 18 ("Standard General contemporaneously sold blocks of directly held TEGNA stock and entered into swaps that conferred indirect beneficial ownership over the same number of TEGNA shares sold.")).

*Reliance Electric Co.* v. *Emerson Electric Co.*, 404 U.S. 418, 423 (1972), that

Section 16(b) "clearly contemplates that a statutory insider might sell enough

shares to bring his holdings below 10%, and later — but still within six

months — sell additional shares free from liability under the statute." (*Id.* at

11). From this holding, Defendants infer that a "less-than-10% owner … may

first sell down its holdings and then continue to trade 'free from liability under

the statute.'" (*Id.* (emphasis omitted) (quoting *Reliance Elec. Co.*, 404 U.S. at

423)).

Plaintiff retorts that while Defendants may have sold their stock, their

post-Record Date sales did not reduce their beneficial ownership. (Pl. Opp. 8-9

(citing Peter J. Romeo & Alan L. Dye, Section 16 Deskbook 96 (Winter 2012)

("Beneficial ownership of securities for purposes of Section 13(d) does not

necessarily terminate when the securities are sold."))). In Plaintiff's view,

Defendants' argument "distorts" the terms of Rule 13d-3(a) (*id.* at 9), and

"defies" a post-*Reliance* decision from a sister court in this District observing

that the beneficial ownership inquiry "does not turn on who owns legal title to

the stock, or who is the registered owner" but "instead … focuses on any

relationship that, *as a factual matter*, confers on a person a significant ability

to affect how voting power or investment power will be exercised," *SEC* v. *Drexel

Burnham Lambert Inc.*, 837 F. Supp. 587, 607 (S.D.N.Y. 1993) (emphasis in

original) (citation and internal quotation marks omitted). Given that the

Court's decision on these arguments hinges on whether Defendants remained

beneficial owners of their sold TEGNA shares, the Court will address the parties' competing interpretations of beneficial ownership.

On this point, Defendants argue that Plaintiff's beneficial ownership theory has no basis in any statute or binding SEC rule or guidance. (Def. Br. 12). Defendants distinguish "voting power" from "*vestigial* voting power," and argue that their retention of the latter was insufficient to establish beneficial ownership over the stock at issue. (*Id.* at 13). Specifically, Defendants claim that they retained merely a "*contingent* ability to vote already-sold shares at a single upcoming stockholder meeting," and observe that the TEGNA Board of Directors retained the discretion under Delaware law to eliminate their vestigial voting power "merely by changing the record date." (*Id.* (citing 8 Del. C. § 213(a))). In response, Plaintiff notes that a stockholder's voting power is always contingent on these variables (Pl. Opp. 9-10), and that perhaps for this reason, Rule 13d-3(a) does not distinguish between "voting power" and "*vestigial* voting power" (*id.* at 10).

The Court finds that Defendants remained the beneficial owners of the shares they sold between March 25 and March 31, 2020, through the conclusion of the Annual Meeting. *First*, such a finding is consistent with the language of Rule 13d-3(a), which defines a beneficial owner as someone who has or shares "the power to vote, or to direct the voting of, such security." 17 C.F.R. § 240.13d-3. Defendants retained the power to vote the sold shares, as evidenced by the allegation that they proceeded to vote those shares at the Annual Meeting. (FAC ¶ 151).

*Second*, this finding is supported by both SEC guidance and industry treatises.  Pursuant to a 2009 SEC Compliance and Disclosure Interpretation, a stockholder who sells all of its shares after a voting record date need not report that it is no longer a beneficial owner until the end of the shareholder annual meeting, as "voting power is not extinguished until the conclusion of the meeting."  SEC Exchange Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting, Compliance & Disclosure Interpretations, Question No. 104.07 (Sept. 14, 2009), https://www.sec.gov/divisions/corpfin/guidance/reg13d-interp.htm (last accessed July 7, 2021).   And multiple treatises comport with this view.  For example, the authors of one leading treatise on Section 16(b) liability have observed that:

> If the sale brings the seller's ownership below 10 percent of the class, the seller will remain a ten percent owner through the stockholder meeting.  In that case, the insider not only will be required to file a Form 4 to report the sale that takes the insider below 10 percent (within two business days of the broker's execution of the trade), but also will be required to report on Form 4 (*and will be subject to potential Section 16(b) liability for*) any additional trades that occur prior to the meeting of stockholders.

Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide 146 n.170 (4th ed. 2012) (emphasis added); *see also* Meredith Brown *et al.*, Takeovers: A Strategic Guide to Mergers and Acquisitions § 2.04[C], at 2-30 n.109 (4th ed. 2019 supp.) ("[A] security holder that sells all of its shares after a voting record date, but before the shareholder meeting date, and retains the right to vote, will continue to beneficially own those shares for Section 13(d)

purposes until the end of the shareholder meeting because its voting power is not extinguished until the conclusion of the meeting." (referencing SEC Compliance & Disclosure Interpretations, Question No. 104.07)).

In response, Defendants argue merely that Plaintiff has not referred the Court to any "binding" sources. (Def. Br. 14-15). But while neither the SEC guidance nor the securities treatises are binding, they are nonetheless persuasive, particularly in light of the absence of any contrary precedent put forth by Defendants. *See Chechele* v. *Elstain*, No. 11 Civ. 3320 (SAS), 2012 WL 607448, at *6 (S.D.N.Y. Feb. 24, 2012) ("Even though the SEC's guidance is not entitled to any deference beyond its power to persuade, it confirms the plain meaning of the Rule[.]"). Moreover, other courts in this Circuit have relied upon SEC Compliance and Disclosure Interpretations and similar informal guidance in assessing a defendant's potential liability under Section 16(b). *See Packer* v. *Raging Cap. Mgmt.*, No. 15 Civ. 5933 (GRB), 2019 WL 3936813, at *5 (E.D.N.Y. Aug. 20, 2019), *vacated and remanded on other grounds*, 981 F.3d 148 (2d Cir. 2020); *see also SEC* v. *Longfin Corp.*, 316 F. Supp. 3d 743, 763 (S.D.N.Y. 2018) (deferring to the "SEC's interpretation of its own regulation" where the Compliance and Disclosure Interpretation was "an entirely reasonable interpretation" of the relevant rule and "consistent with the position" advanced by the SEC in the litigation); *cf. Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi.* v. *Bank of N.Y. Mellon*, 775 F.3d 154, 170 (2d Cir. 2014) (determining that SEC interpretive guidance regarding the Trust

Indenture Act of 1939 "carries some persuasive force in light of the complex statutory scheme and the SEC's expertise in this specialized field").[5]

Defendants express concern that this interpretation of Section 16(b) would create a "trap" for investors, and argue that there is no basis for inferring that Congress had any such intent. (Def. Br. 13). In particular, they contend that transactions "unwittingly executed after the record date but before the *announcement* of the record date could, at the *board's* election, become retroactively subject to Section 16(b)." (*Id.* (emphases in original)).[6] Defendants also refer the Court to the Supreme Court's decision in *Foremost-McKesson, Inc.*, 423 U.S. at 252, observing that "[i]f Congress wishes to impose [Section 16(b)] liability, we must assume it will do so expressly or by unmistakable inference." (*Id.* at 11). The Court does not seek to minimize Defendants' concerns, but does not find them sufficient to adopt Defendants'

---

[5]    Defendants argue that these cases are "unavailing" as they either involved different Compliance and Disclosure Interpretations or were matters where the SEC was a party to the litigation. (Def. Reply 8 n.12). In the Court's view, these decisions stand for the uncontroversial principle that the Court may take note of SEC guidance, particularly where Defendants have provided no compelling sources to the contrary.

Defendants separately observe that the relevant Compliance and Disclosure Interpretation pertains to Rule 13(d) disclosure practices, rather than to Section 16(b) liability. (Def. Br. 15). Defendants are correct that the Compliance and Disclosure Interpretation addresses the definition of beneficial ownership under Rule 13(d), but this definition has been adopted in turn for the purposes of Section 16(b). *See Rubenstein* v. *Int'l Value Advisers, LLC*, 363 F. Supp. 3d 379, 389 (S.D.N.Y. 2019), *aff'd* 959 F.3d 541 (2d Cir. 2020). As such, the Court finds the SEC's guidance relevant to its consideration of beneficial ownership under Section 16(b).

[6]    The Court is not persuaded by this argument, which, rather than providing a basis for rethinking this Circuit's application of Section 16(b), at most, takes issue with the practice of announcing voting record dates on an *ex post* basis. Moreover, the Court notes that the transactions at issue took place either the day of, or in the days after, TEGNA's announcement of its Record Date. (*See* Martin Decl., Ex. 7 at 4 (March 25, 2020 Notice of Annual Meeting of Shareholders)).

unsupported view of beneficial ownership. The Second Circuit has observed

that "§ 16(b) creates mechanical requirements, and is simple and arbitrary in

its application." *Gibbons* v. *Malone*, 703 F.3d 595, 603 (2d Cir. 2013) (internal

citations and quotation marks omitted). In applying these "mechanical

requirements," the Court finds that Defendants remained beneficial owners of

the sold TEGNA stock until the conclusion of the Annual Meeting. Thus, as

alleged in the Amended Complaint, Defendants became 10% beneficial owners

of TEGNA's common stock on March 25, 2020, following their entry into a swap

agreement that gave them beneficial ownership of 1,000,000 additional shares.

(FAC ¶ 119). Absent any applicable exemptions, Defendants' subsequent Post-

Record Date Transactions were subject to Section 16(b). (*Id.* at ¶ 122).

### 2. Defendants' Post-Record Date Transactions Are Not Exempt from Section 16(b)

Defendants argue that even if they were statutory insiders, their Post-

Record Date Transactions are exempt from Section 16(b) liability under

Rule 16a-13. (Def. Br. 16-24 (discussing 17 C.F.R. § 240.16a-13)). Rule 16a-

13 exempts from Section 16(b) liability "[a] transaction, other than the exercise

or conversion of a derivative security or deposit into or withdrawal from a

voting trust, that effects only a change in the form of beneficial ownership

without changing a person's pecuniary interest in the subject equity

securities." 17 C.F.R. § 240.16a-13. In their briefing, Defendants submit that

the majority of their Post-Record Date Transactions merely effected a change in

the form of their beneficial ownership over TEGNA's shares. (Def. Br. 16-22).

Defendants further argue that Plaintiff has failed to allege that the Post-Record

Date Transactions changed their "pecuniary interest" in TEGNA stock.  (*Id.* at

22-24).  The Court rejects both of these arguments.

### a. The Post-Record Date Transactions Were Not a Mere Change in the Form of Defendants' Beneficial Ownership

While Rule 16a-13 does not itself provide guidance as to what

transactions would fall under this exemption, both the SEC and commentators

have supplied instructive examples.  *See Donoghue* v. *Novastar Fin., Inc.*,

No. 04 Civ. 6857 (KMW), Docket Entry 33 at 21-22 (S.D.N.Y. Mar. 27, 2006)

(discussing Rule 16a-13).  The SEC has indicated that, "[f]or example,

distributions of equity securities from an employee benefit plan to an insider

participant would be a mere change in the form of beneficial ownership from

indirect to direct where the securities previously had been attributed to the

insider."  Ownership Reports and Trading by Officers, Directors and Principal

Security Holders, Exchange Act Releases Nos. 34-37260, 35-26524, 61 Fed.

Reg. 30376, 30385 n.117 (June 14, 1996).  And an industry treatise has

offered the additional examples of (i) a distribution of shares from a trust to an

insider-beneficiary of the trust and (ii) a distribution of securities from a limited

partnership to its general partner.  Romeo & Dye, Section 16 Deskbook, *supra*,

at 300.

Defendants contend that the Post-Record Date Transactions functioned

to change the form of their beneficial ownership of 5,000,000 TEGNA shares

from direct to indirect.  (Def. Br. 16-22).  Specifically, Defendants contend that

on each business day between March 25 and March 31, 2020, they sold a

subset of their directly-held TEGNA shares, and then entered into a swap

agreement that conferred upon them indirect beneficial ownership over the same number of TEGNA shares. (*Id.* at 16-17). Defendants conclude that each of these paired sales and swap trades "comprised but a single transaction" and cannot be "fragmentized" into multiple transactions subjecting them to Section 16(b) liability. (*Id.* at 17-22).[7]

---

[7] Defendants make the related argument that the Post-Record Date Transactions did not allow for speculative abuse, as they "clearly intended that each sale leg would not be executed without a corresponding, offsetting and contemporaneous swap." (Def. Br. 21). Plaintiff responds that Defendants' trades presented "at least an opportunity for speculative abuse," as Defendants had the opportunity to arrange and time their separate sales and swap trades to exploit any changes in the price of TEGNA stock. (Pl. Opp. 18).

The Second Circuit has advised that "Section 16(b) should be applied without further inquiry if there is at least the possibility of speculative abuse of inside information." *Huppe* v. *WPCS Int'l Inc.*, 670 F.3d 214, 219 (2d Cir. 2012) (internal quotation marks and citation omitted). Courts apply a "potential for speculative abuse" test when confronted with "unorthodox" or "borderline" transactions "that are not 'classic purchases and sales for cash' within the literal terms of the statute." *Donoghue* v. *Casual Male Retail Grp., Inc.*, 375 F. Supp. 2d 226, 231 (S.D.N.Y. 2005) (quoting *Steel Partners II, L.P.* v. *Bell Indus., Inc.*, 315 F.3d 120, 124 (2d Cir. 2002)). In *Kern County* v. *Occidental Petroleum Corp.*, the Supreme Court recognized that certain "borderline transactions" will be exempt from Section 16(b) where they do not "serve as a vehicle for the evil which Congress sought to prevent — the realization of short-swing profits based upon access to inside information." 411 U.S. 582, 594 (1973).

In their reply brief, Defendants allude to an argument that the Post-Record Date Transactions were "borderline," and in support, refer the Court generally to the remainder of their briefing. (Def. Reply 10 n.17). The Second Circuit has indicated that the borderline transaction exception is applicable to "[i] an involuntary transaction by an insider [ii] having no access to inside information." *Analytical Survs., Inc.* v. *Tonga Partners, L.P.*, 684 F.3d 36, 45 (2d Cir. 2012) (internal quotation marks and citation omitted). The Court agrees with Plaintiff that Defendants cannot claim the protections of this exception, as the Post-Record Date Transactions were not "involuntary." (*See* Pl. Opp. 23). To the contrary, the Amended Complaint alleges that Defendants controlled the timing of their sales and swap transactions. (FAC ¶¶ 91-103). For similar reasons, the Court disagrees with the contention that the transactions did not present the opportunity for speculative abuse. One of the "primary indices" used for measuring the potential for speculative use is "the defendant's ability to influence the timing and circumstances of the transaction at issue." *Casual Male Retail Grp.*, 375 F. Supp. 2d at 231-32 (internal quotation marks and citations omitted). As noted, Defendants had the ability to influence the timing of the Post-Record Date Transactions and to structure the trades so as to profit from short-term price fluctuations. *See id.* at 233 ("[T]here was a sufficient 'span of time between the purchase[s] and sale in which the market could fluctuate' to give rise to the 'possibility for insider speculation.'" (second alteration in *Casual Male Retail Group*) (quoting *Rosen* v. *Drisler*, 421 F. Supp. 1282 (S.D.N.Y. 1976))); *cf. Olagues* v. *Icahn*, No. 15 Civ. 898 (GHW), 2016 WL 1178777, at *15 (S.D.N.Y.

Defendants' argument asks the Court to ignore the reality of the Post-Record Date Transactions. While the transactions at issue may have occurred in close proximity and as part of a single trading strategy, they remained separate transactions executed at different times. *Cf. Avalon Holdings Corp.* v. *Gentile*, No. 18 Civ. 7291 (VSB), 2019 WL 4640206, at *6-7 (S.D.N.Y. Sept. 24, 2019) (finding that high-frequency trades appeared to fall within "the literal terms of Section 16(b)"). Defendants refer the Court to a number of cases in which plaintiffs endeavored to "fragmentize" the transactions at issue into hypothetical separate transactions. *See, e.g.*, *Rubenstein* v. *Live Nation Ent.*, No. 16 Civ. 7283 (RWS), 2017 WL 2670749, at *6 (S.D.N.Y. June 20, 2017); *Olagues* v. *Icahn*, No. 15 Civ. 898 (GHW), 2016 WL 1178777, at *11 (S.D.N.Y. Mar. 23, 2016), *aff'd*, 866 F.3d 70 (2d Cir. 2017); *Portnoy* v. *Memorex Corp.*, 667 F.2d 1281, 1284 (9th Cir. 1982).[8] While the Court acknowledges that this

---

Mar. 23, 2016) (declining to find speculative abuse where "[t]he exercise price for the call options was fixed at the time [those] transactions were executed"), *aff'd*, 866 F.3d 70 (2d Cir. 2017). The Court thus finds that Defendants' transactions involved the very potential for speculative abuse that Congress sought to prevent through Section 16(b)'s enactment.

[8] Defendants also point the Court to *Reece Corp.* v. *Walco National Corp.*, 565 F. Supp. 158 (S.D.N.Y. 1981), in which case the counterparties intentionally divided a transaction into two sales so as to avoid Section 16(b) liability. *Id.* at 159-60. While the first sale occurred within six months of a prior purchase and thus fell within Section 16(b), the *Reece* court considered whether the second sale, at which time the seller no longer owned 10% of the company's stock, was a separate "'sale' within the meaning of [Section 16(b)]." *Id.* at 161. The court ultimately determined that these sales were part of a "single plan of disposition" and accordingly "a single sale" for the purpose of applying Section 16(b), after making the following observations:

> In the present case there was a single plan of disposition negotiated by Walco with the same buyer — Reece. From the start of the negotiations between Walco and Reece, it was agreed that the shares would be sold to Reece for a price of $12 per share. After this understanding was reached, the parties broke the transaction into two stages for the purpose of avoiding full § 16(b) liability. However, the average price per share of $12 never changed. The

line of cases cautions against "recasting an actual transaction into something a plaintiff hypothesizes it could have been in order to create liability under Section 16(b)[,]" *Live Nation Ent.*, 2017 WL 2670749, at *6, it does not find that any such recasting has taken place here. Plaintiff has not artificially partitioned a single trade into several hypothetical components, *see id.*, or asked the Court to "go behind the face of the transaction and recharacterize it," *Portnoy*, 667 F.2d at 1284, as did the plaintiffs in the cases cited in Defendants' briefing. Rather, Plaintiff has alleged that Defendants conducted a series of transactions "separately and independently of one another, at slightly different times, [ ] with different counterparties," and at different prices. (FAC ¶¶ 99-100). Defendants' assertion that the transactions were conducted as part of "a single plan" (Def. Br. 19) may indicate their "*intent* in engaging in these transactions, but it does not determine the *substance* of these transactions," *Novastar*, No. 04 Civ. 6857 (KMW), Docket Entry 33 at 22-23 (emphases in original) (finding that defendant's purchase of shares for one account and sale of the same number of shares from another account, in lieu of transferring the shares between accounts, was not "a mere change in his

---

two stages of the sale took place one day apart. Although there was no express legal tie between the two phases, the transaction was structured with the expectation that one would not be carried out without the other. Neither side received the full bargained-for benefits from the first "sale." It was only after the completion of the entire transaction that Walco received its profits and Reece received the complete package of stock along with the covenants.

*Id.* at 162. In contrast, in the instant matter, there was no set of pre-arranged trades with a single counterparty. Rather, Defendants conducted separate trades with different counterparties at varying prices. (FAC ¶¶ 92-98, 104). The Court is thus not persuaded that each of Defendants' daily stock sales and swap agreements constituted a single transaction.

form of ownership of the securities involved"). As these trades were executed independently of each other, they do not constitute a single transaction that changed the form of Defendants' beneficial ownership. While this alone provides a sufficient basis for finding the Rule 16a-13 exemption inapplicable, in the interest of completeness, the Court will address a second basis proffered by Plaintiff.

**b. The Post-Record Date Transactions Changed Defendants' Pecuniary Interests**

Defendants separately argue that Plaintiff has failed to allege that the Post-Record Date Transactions changed their pecuniary interest in TEGNA stock, and that the transactions are thus exempt from Section 16(b) liability under Rule 16a-13. (Def. Br. 22-24). The term "pecuniary interest" is defined as "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." 17 C.F.R. § 240.16a-1(a)(2)(i).

Defendants argue that Plaintiff has alleged two forms of indirect pecuniary interest, both of which were unchanged by the Post-Record Date Transactions: (i) a performance-based fee calculated from capital appreciation in the fund portfolios managed by Kim and Standard General; and (ii) an economic interest in the funds' trades arising from management's investment in the funds. (Def. Br. 22 (citing FAC ¶¶ 137-38)). Plaintiff submits that the Standard General Master Fund's pecuniary interests changed during the window between its separately executed stock sales and swap transactions, when it had neither direct nor indirect beneficial ownership over the stock. (Pl. Opp. 16). In Plaintiff's view, had TEGNA's stock price risen during this period,

the Standard General Master Fund would have had the opportunity to profit from these price fluctuations.  (*Id.* at 16-17).  Defendants counter that TEGNA's stock price *did* rise during this window, but that this caused them losses, rather than gains.  (Def. Reply 10 (citing FAC ¶ 104)).  While Defendants dispute the extent to which the Post-Record Date Transactions provided them with an opportunity to profit from fluctuations in TEGNA's sale price, they appear to concede that their pecuniary interests changed, given that the transactions resulted in losses.  *See Novastar*, No. 04 Civ. 6857 (KMW), Docket Entry 33 at 23-24 (observing that defendant's pecuniary interest did not remain unchanged where the transactions entailed a loss, and that had the market moved differently, the transactions might have entailed a profit).  For this reason as well, the Court finds that Defendants are not exempt from Section 16(b) liability.[9]

### 3. Plaintiff Is Not Barred from Seeking Disgorgement

Defendants next argue that Plaintiff is barred from seeking disgorgement because such an award would be in excess of Defendants' actual net profits from the Post-Record Date Transactions.  (Def. Br. 24).  In this regard, they

---

[9]     As Kim and Standard General are alleged to own about 4% of the Standard General Master Fund (FAC ¶ 144), the Court accepts that any change to the pecuniary interest of the Standard General Master Fund would have in turn impacted the other Defendants' indirect pecuniary interests.  *See* 17 C.F.R. § 240.16a-1(a)(2)(ii) ("the term indirect pecuniary interest shall include … [a] general partner's proportionate interest in the portfolio securities held by a general or limited partnership").

Plaintiff separately argues that the exemption is inapplicable because the Post-Record Date Transactions changed the pecuniary interests of Defendants' counterparties.  (Pl. Opp. 16).  Defendants disagree with the contention that any impact on their counterparties' pecuniary interests is relevant to this inquiry.  (Def. Reply 9-10).  The Court need not resolve this dispute, as it has concluded that the exemption is inapplicable for the reasons detailed above.

first submit that each pair of Post-Record Date Transactions was unprofitable, and that Defendants cannot "mix and match" the transactions so as to "gin up disgorgeable profit." (*Id.*). Defendants then make the related argument that the "lowest in, highest out" method of calculating disgorgeable profits used in this Circuit is no longer good law in light of recent Supreme Court precedent. (*Id.*; *see also* Dkt. #32). The Court disagrees.

Under the "established method" of calculating disgorgeable "profits" from short-swing trading in this Circuit, "an individual may be charged with a Section 16(b) profit even when his or her relevant trading actually resulted in a substantial financial loss." *Lowinger* v. *Morgan Stanley & Co.*, 841 F.3d 122, 129 n.6 (2d Cir. 2016) (collecting cases). In light of the "broadly remedial" purposes of Section 16(b), the Second Circuit has long applied the rule of "lowest price in, highest price out," with the goal of ensuring recovery of "all possible profits." *See Smolowe* v. *Delendo Corp.*, 136 F.2d 231, 239 (2d Cir. 1943); *accord Microbot Med., Inc.* v. *Mona*, No. 19 Civ. 3782 (GBD) (RWL) 2020 WL 8671943, at *10 (S.D.N.Y. Dec. 17, 2020), *report and recommendation adopted*, No. 19 Civ. 3782 (GBD) (RWL), 2021 WL 1192110 (S.D.N.Y. Mar. 30, 2021), *appeal docketed*, No. 21-1038 (2d Cir. Apr. 23, 2021). The Second Circuit has offered the following example to illustrate the application of this rule in practice:

> [I]magine a statutory insider who purchases 100 shares at $100 per share on January 1, sells 100 shares at $50 per share on February 1, purchases 100 shares at $150 per share on March 1, and sells 100 shares for $125 per share on April 1. This trader has lost $7,500 in real

> terms, but he has a profit of $2,500 for Section 16(b) purposes.

*Lowinger*, 841 F.3d at 129 n.6.  Applied here, the Court can match Defendants' purchases and sales comprising the Post-Record Date Transactions and arrive at a profit of roughly $4,840,000.  (FAC ¶ 160; *see also id.* at ¶ 130 (table summarizing the Section 16(b) treatment of the Post-Record Date Transactions)).

Defendants argue that the "lowest price in, highest price out" rule has been called into question by the Supreme Court's decision last year in *Liu* v. *SEC*, 140 S. Ct. 1936 (2020).  In *Liu*, the Supreme Court considered the scope of Section 78u(d)(5) of the Exchange Act, which provision gives the SEC the power to seek "any equitable relief" in civil actions.  *Id.* at 1940.  Following a review of "works on equity jurisprudence," *id.* at 1942-46, the Court determined that Congress had incorporated these "longstanding equitable principles" into Section 78u(d)(5), and in doing so, had "prohibited the SEC from seeking an equitable remedy in excess of a defendant's net profits from wrongdoing," *id.* at 1946.  The Court concluded that disgorgement was a type of "equitable relief" that the SEC may seek under Section 78u(d)(5), but that it was subject to equitable limitations, and that the SEC thus could not seek a disgorgement award that exceeded the wrongdoer's net profits.  *Id.* at 1946-47.

Defendants acknowledge that *Liu* pertained to a different provision of the Exchange Act, but argue that its holding is nonetheless directly applicable here.  (Def. Br. 24; Def. Reply 4).  Plaintiff rejoins that *Liu* does not mandate departure from a method of profit calculation that this Circuit has followed for

more than 75 years.  (Pl. Opp. 25).  The Court agrees with Plaintiff that the Supreme Court's reasoning in *Liu* is not easily imported into the Section 16(b) context.  *First*, the Supreme Court's decision rested on the statutory construction of Section 78u(d)(5), which provision referenced "a remedy grounded in equity," and thus "absent other indication, [must] be deemed to contain the limitations upon its availability that equity typically imposes."  140 S. Ct. at 1947 (internal quotation marks omitted) (quoting *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U.S. 204, 211 n.1 (2002)).  In contrast, Section 16(b) does not contain the same limitations, but rather, provides that "suit to recover … profit may be instituted *at law* or in equity."  15 U.S.C. § 78p(b) (emphasis added).  As such, it is not subject to the same constraints as Section 78u(d)(5).  *Cf. SEC* v. *Quan*, 817 F.3d 583, 594 (8th Cir. 2016) ("[Defendant] cites no authority suggesting a lawsuit by an organ of the government acting in the public interest to enforce specific statutory and regulatory provisions and prevent violators from keeping their ill-gotten gains resembles a traditional suit at law.").  *Second*, at this time, the Supreme Court's decision appears cabined to the SEC's power to seek disgorgement. Defendants point to no cases that have read *Liu* to limit private litigants' ability to seek disgorgement, and the Court is aware of none.  *Cf. SEC* v. *Laura*, No. 15 Civ. 5075 (NGG) (VMS), 2020 WL 8772252, at *4-5 (E.D.N.Y. Dec. 30, 2020) (rejecting argument that *Liu* "stands for the broad proposition that insofar as the SEC seeks a disgorgement remedy, it does so on behalf of wronged investors, and its remedy is limited to that which the investors could pursue on

28

their own").  The Court thus declines to apply *Liu* to the Section 16(b) context

in order to find that Plaintiff is barred from seeking disgorgement here.[10]

### 4.  Disgorgement Is Not Inconsistent with Section 16(b)'s Statutory Purpose

Lastly, Defendants argue that subjecting them to Section 16(b) liability

would be inconsistent with the provision's purpose.  (Def. Br. 25).  Defendants

contend that Standard General "was the consummate *outsider*," and reiterate

their argument that the Post-Record Date Transactions presented no

opportunity for speculative abuse.  (*Id.* (emphasis in original)).  They submit

that holding Defendants strictly liable under Section 16(b) on these facts would

be "wholly inconsistent" with the statute's legislative purpose, particularly

given that Standard General voted less than 10% of TEGNA's outstanding stock

at the Annual Meeting.  (*Id.*).

---

[10]     Following the conclusion of briefing on the instant motion, Defendants submitted a letter to notify the Court of the Supreme Court's decision in *AMG Capital Management, LLC* v. *FTC*, 141 S. Ct. 1341 (2021).  (*See* Dkt. #32).  In *AMG Capital Management*, the Supreme Court considered the scope of the Federal Trade Commission's ("FTC's") powers under Section 13(b) of the Federal Trade Commission Act.  *See generally* 141 S. Ct. at 1346-52 (discussing 15 U.S.C. § 53(b)).  The Court determined that Section 13(b)'s language, which authorizes the FTC to obtain a "permanent injunction" against those violating or about to violate a law that it enforces, did not authorize the FTC to obtain court-ordered equitable monetary relief such as restitution or disgorgement.  *Id.* at 1344.  Defendants characterize this decision as confirming that courts cannot expand equitable remedies to allow monetary relief "beyond the plain statutory language," and assert that this principle, applied here, requires capping disgorgement under Section 16(b) at the Defendants' net profits.  (Dkt. #32).  Plaintiff responds that *AMG Capital Management* pertains only to the Federal Trade Commission Act, and does not compel this Court to disregard the Second Circuit's method of calculating profit under Section 16(b).  (Dkt. #33 at 1-2).  The Court does not read *AMG Capital Management* to limit the disgorgement remedy available under Section 16(b), given that the decision focuses on the statutory construction of various provisions of the Federal Trade Commission Act.  Moreover, even were the Court to read *AMG Capital Management* broadly, as urged by Defendants, the Court disagrees that "the plain statutory language" of Section 16(b) necessarily requires limiting disgorgement to Defendants' net profits.

For substantially the reasons discussed above, the Court is not persuaded by these arguments. Defendants refer the Court to cases either involving the "borderline transaction" doctrine or finding a failure to allege the elements of a Section 16(b) claim. (Def. Br. 25). As discussed *supra*, Defendants have not established that the borderline transaction doctrine is applicable here, and in any event, the Court has concluded that the Post-Record Date Transactions *did* present an opportunity for speculative abuse. *See* Discussion Sec. B.2 n.7. "Section 16(b) operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." *Magma Power Co.* v. *Dow Chem. Co.*, 136 F.3d 316, 320-21 (2d Cir. 1998). Plaintiff has stated a claim under Section 16(b), and Defendants have not persuaded the Court that they qualify for the protections of any applicable exemption. As such, permitting the litigation to proceed, at least at this stage, is not merely consistent with Section 16(b)'s legislative purpose, but is required under the terms of the statute.

## CONCLUSION

For the reasons set forth in this Opinion, Defendants' motion to dismiss is DENIED. Moreover, Defendants' letter motion for oral argument is DENIED as moot. The Clerk of Court is directed to terminate the motions at docket entries 25 and 31. Defendants are hereby ORDERED to file a responsive pleading on or before July 29, 2021. Further, the parties are directed to

submit a joint letter and Proposed Case Management Plan and Scheduling Order to the Court on or before August 12, 2021.

      SO ORDERED.

Dated:      July 8, 2021
              New York, New York

                                      KATHERINE POLK FAILLA
                                  United States District Judge