UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DONNA ANN GABRIELE CHECHELE,

                              Plaintiff,

                -v.-

STANDARD GENERAL L.P.; STANDARD
GENERAL MASTER FUND L.P.; and
SOOHYUNG KIM,

                              Defendants,

TEGNA, INC.,

                              Nominal Defendant.

20 Civ. 3177 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

Plaintiff Donna Ann Gabriele Chechele brought this action pursuant to Section 16(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), 15 U.S.C. § 78p(b), on behalf of nominal defendant TEGNA, Inc. ("TEGNA"). In brief, Plaintiff sought recovery of profits allegedly realized by Defendants Standard General L.P. ("Standard General"), Standard General Master Fund L.P. (the "Standard General Master Fund" or the "Fund"), and Soohyung Kim (together, "Defendants"), as a result of certain purchases and sales of TEGNA stock in early 2020. Defendants previously moved to dismiss Plaintiff's Complaint, and this Court denied that motion by Opinion and Order dated July 8, 2021 (the "July 8 Order"). *See Chechele* v. *Standard Gen. L.P.*, No. 20 Civ. 3177 (KPF), 2021 WL 2853438 (S.D.N.Y. July 8, 2021). Defendants now seek to have the Court certify the July 8 Order for interlocutory appeal to the United States Court of Appeals for the Second Circuit, arguing that the

Supreme Court's decision in *Liu* v. *SEC*, 140 S. Ct. 1936 (2020), has both up-ended the Second Circuit's "lowest price in, highest price out" methodology for determining profits and, more pointedly, foreclosed Plaintiff from pleading a claim under Section 16(b) in this case.  For the reasons set forth in the remainder of this Opinion, the Court denies Defendants' motion.

**BACKGROUND**[1]

**A.    Factual Background**

The Court presumes familiarity with the factual summary and procedural history outlined in its July 8 Order, and will accordingly limit its recapitulation here.  (*See* Dkt. #35).  During the relevant time period, Standard General served as the investment manager of the Standard General Master Fund and, in that capacity, invested the Fund's capital according to stipulated investment objectives.  (*Id.* at 2).  Soohyung Kim was Standard General's managing partner, chief executive officer, and chief investment officer.  Both Plaintiff and Standard General owned securities in TEGNA, a publicly held media company.  (*Id.*).

The instant litigation arose from certain securities transactions conducted in the shadow of TEGNA's annual shareholders' meeting, for which the record date was ultimately set as March 20, 2020.  (Dkt. #35 at 3).  In January 2020, Standard General was a beneficial owner of TEGNA's common

---

[1]    For ease of reference, the Court refers to its Opinion and Order of July 8, 2021, as the "July 8 Order" (Dkt. #35); Defendants' opening brief as "Def. Cert. Br." (Dkt. #39); Plaintiff's opposition brief as "Pl. Cert. Opp." (Dkt. #44); and Defendants' reply brief as "Def. Cert. Reply" (Dkt. #47).  References to the docket for *SEC* v. *Liu*, No. 16 Civ. 974 (CJC) (C.D. Cal.), are cited using the convention "Liu Dkt. #[ ]."

stock, in the form of both physical shares and equity swaps transactions with a physical settlement option. (*Id.* at 3-4). On March 16, 2020, after exercising that option with respect to various outstanding equity swaps, Standard General "had the right to direct how 21,124,315 physical shares of TEGNA's common stock — or about 9.7% of TEGNA's outstanding shares — would be voted at [TEGNA's] annual meeting." (*Id.* at 4). Thereafter, in late March and early April 2020, Standard General sold shares of TEGNA stock; entered into new equity swap agreements that could be settled for an equivalent number of shares; and, on April 2, 2020, repurchased 4,591,164 shares in a single transaction. (*Id.* at 4-5). In consequence, according to Plaintiff, "each Standard General Defendant was a beneficial owner of more than 10% of TEGNA's outstanding common stock at all relevant times after March 25, 2020," and was thus subject to both the reporting requirements of Section 16(a) and the restrictions on purchases and sales of Section 16(b). (Dkt. #23 at ¶ 23). *See generally* 15 U.S.C. § 78p. Plaintiff claims that Defendants realized millions of dollars in short-swing profits from transactions conducted between March 26, 2020, and April 2, 2020, and that such profits are subject to disgorgement pursuant to Section 16(b). (*Id.* at ¶¶ 6, 25, 131-146, 160).

### B.    Procedural Background

On April 2, 2020, Plaintiff's counsel sent a demand letter to TEGNA on Plaintiff's behalf, requesting recovery of Standard General's short-swing profits realized from the challenged transactions in TEGNA's common stock and derivative securities. (Dkt. #23 at ¶ 147). In an April 14, 2020 letter response,

TEGNA informed Plaintiff that it declined to pursue a Section 16(b) claim against Standard General.  (*Id.* at ¶ 148).

Plaintiff commenced this action with the filing of her Complaint on April 22, 2020 (Dkt. #1), and later filed an Amended Complaint on September 11, 2020 (Dkt. #23).  Defendants responded with a motion to dismiss the Amended Complaint, filed on October 12, 2020.  (Dkt. #25-27).

The Court denied Defendants' motion in the July 8 Order.  (Dkt. #35). The July 8 Order began by discussing whether Standard General qualified as a statutory insider under Section 16(b) by dint of its beneficial ownership of TEGNA stock.  (*Id.* at 11-25).  On this point, the Court found that Defendants' retention of what they termed "vestigial" or "contingent" voting power over the shares they sold between March 25 and March 31, 2020, rendered them beneficial owners of more than ten percent of TEGNA's outstanding common stock, thus qualifying them as statutory insiders pursuant to Section 16(b). (*Id.* at 11-19).  *See* 15 U.S.C. § 78p(a)(1) ("Every person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security (other than an exempted security) which is registered pursuant to section 78l of this title … shall file the statements required by this subsection with the Commission."); 17 C.F.R. § 240.16a-1(a)(1) (defining "beneficial owner" as "any person who is deemed a beneficial owner pursuant to section 13(d) of the Act and the rules thereunder"); 17 C.F.R. § 240.13d-3(a) (defining beneficial owner to include voting power).  The Court next rejected Defendants' arguments that even if they were statutory insiders, the stock

transactions in late March and early April 2020 were exempt from Section 16(b) liability under Rule 16a-13 because (i) they were all part of a single plan that amounted to a mere change in the form of Defendants' beneficial ownership, and (ii) the various transactions did not alter Defendants' pecuniary interest in TEGNA.  (*See id.* at 19-25).

On a single page in their opening motion to dismiss brief, Defendants argued that Plaintiff could not adequately plead profits from the challenged transactions, in part because the Second Circuit's longstanding use of the "lowest price in, highest price out" rule for calculating profits had been fatally undermined by the Supreme Court's decision in *Liu* (*see* Dkt. #26 at 24); the argument was then presented with greater detail in Defendants' reply submission (*see* Dkt. #30 at 2-5).  In the July 8 Order, the Court rejected these arguments, and "agree[d] with Plaintiff that the Supreme Court's reasoning in *Liu* is not easily imported into the Section 16(b) context."  (Dkt. #35 at 28). Among other things, the Court noted that the text of Section 16(b), which authorized the filing of suits "at law or in equity," 15 U.S.C. § 78p(b), was materially different from the equity-only disgorgement provision at issue in *Liu*, 15 U.S.C. § 78u(d)(5).  (*Id.*).  In addition, the Court found no basis to extrapolate the *Liu* decision from the regulatory enforcement context in which it arose.  (*Id.*).

Two weeks later, on July 22, 2021, Defendants filed their motion to certify the July 8 Order for interlocutory appeal.  (Dkt. #37-39).  Plaintiff filed her submission in opposition on August 13, 2021.  (Dkt. #44).  Defendants

filed their reply submission and request for oral argument on August 27, 2021.
(Dkt. #47-48).  The Court will now consider Defendants' motion.[2]

## DISCUSSION

### A.   Applicable Law

Under Section 1292(b), a district court may certify an order for
interlocutory appeal when it is "of the opinion that such order [i] involves a
controlling question of law [ii] as to which there is substantial ground for
difference of opinion and [iii] that an immediate appeal from the order may
materially advance the ultimate termination of the litigation."  28 U.S.C.
§ 1292(b); *see also Casey* v. *Long Island R.R. Co.*, 406 F.3d 142, 145-46 (2d Cir.
2005); *In re Purdue Pharma, L.P.*, No. 21 Civ. 7532 (CM), 2022 WL 121393, at
*1 (S.D.N.Y. Jan. 7, 2022); *Orthodox Jewish Coal. of Chestnut Ridge* v. *Vill. of
Chestnut Ridge, New York*, No. 19 Civ. 443 (KMK), 2021 WL 6127049, at *8
(S.D.N.Y. Dec. 28, 2021).  The Second Circuit has cautioned that Section
1292(b) is to be strictly construed, because "the power to grant an interlocutory
appeal must be strictly limited to the precise conditions stated in the law."
*Klinghoffer* v. *S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990) (internal
quotation marks and brackets omitted).[3]  At the same time, the Court of

---

[2]   On March 9, 2022, Defendants moved to stay the action in light of an agreement by
which TEGNA would be acquired by an affiliate of Standard General; the acquisition,
Defendants argued, would moot the current lawsuit.  (Dkt. #49).  That same day, the
Court solicited a response from Plaintiff.  (Dkt. #50).  Because resolution of the instant
motion would not impact the issues raised in Defendants' motion to stay, the Court has
elected to issue this Opinion while the latter motion remains pending.

[3]   The Second Circuit has also observed that "[i]t is a basic tenet of federal law to delay
appellate review until a final judgment has been entered."  *Koehler* v. *Bank of Berm.
LTD*, 101 F.3d 863, 865 (2d Cir. 1996) (internal citations omitted); *see also In re Flor*, 79
F.3d 281, 284 (2d Cir. 1996) (Section 1292(b) certification should be "strictly limited

Appeals has advised district courts that "[w]hen a ruling satisfies [all three] criteria and 'involves a new legal question or is of special consequence,' then the district court 'should not hesitate to certify an interlocutory appeal.'" *Balintulo* v. *Daimler AG*, 727 F.3d 174, 186 (2d Cir. 2013) (quoting *Mohawk Indus., Inc.* v. *Carpenter*, 558 U.S. 100, 111 (2009)).

The movant bears the burden of demonstrating that all three of the substantive criteria of Section 1292(b) are met. *See Casey*, 406 F.3d at 146 ("[Section 1292(b)], by its terms, thus imposes both procedural and substantive requirements on a would-be appellant."); *see also SEC* v. *Rio Tinto PLC*, No. 17 Civ. 7994 (AT), 2021 WL 1893165, at *1-3 (S.D.N.Y. May 11, 2021). "[E]ven where the three legislative criteria of Section [ ] 1292(b) appear to be met, district courts retain unfettered discretion to deny certification if other factors counsel against it." *Transp. Workers Union of Am., Local 100* v. *N.Y.C. Transit Auth.*, 358 F. Supp. 2d 347, 351 (S.D.N.Y. 2005) (internal citations omitted); *accord Commerzbank AG* v. *U.S. Bank Nat'l Ass'n*, No. 16 Civ. 4569 (WHP), 2021 WL 603045, at *6 (S.D.N.Y. Feb. 16, 2021).

---

because 'only exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'" (quoting *Klinghoffer* v. *S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990) (alteration in *Flor*)). From this, district courts have noted that "federal practice strongly disfavors discretionary interlocutory appeals [as they] prolong judicial proceedings, add delay and expense to litigants, burden appellate courts, and present issues for decisions on uncertain and incomplete records, tending to weaken the precedential value of judicial opinions." *SEC* v. *Straub*, No. 11 Civ. 9645 (RJS), 2013 WL 4399042, at *2 (S.D.N.Y. Aug. 5, 2013) (alteration in *Straub*) (quoting *In re World Trade Ctr. Disaster Site Litig.*, 469 F. Supp. 2d 134, 144 (S.D.N.Y. 2007)); *see also Glatt* v. *Fox Searchlight Pictures, Inc.*, No. 11 Civ. 6784 (WHP), 2013 WL 5405696, at *1 (S.D.N.Y. Sept. 17, 2013) ("Interlocutory appeals are strongly disfavored in federal practice." (internal quotation marks and citation omitted)).

**B.**     **Analysis**

While acknowledging that the "lowest price in, highest price out" rule for calculating profits under Section 16(b) has been the "established method" in this Circuit for years, Defendants argue that "at least one Supreme Court decision ... now provides substantial ground for disagreement that litigants may still seek disgorgement awards under Section 16(b) in excess of defendants' actual gains." (Def. Cert. Br. 1). Moreover, Defendants argue, if the Second Circuit were to find "that the disgorgement remedy sought here is also limited by the same equitable principles that drove the Supreme Court's decision in *Liu*" (*id.*), the result would *not* be a reduction in profits subject to disgorgement, but rather an inability of Plaintiff to plead and prove a necessary element of the Section 16(b) claim (*see id.* at 10-11; Def. Cert. Reply 9). *See generally Roth* v. *Jennings*, 489 F.3d 499, 516-17 (2d Cir. 2007) (dismissing complaint for failure to plead profits realized from short-swing transactions). Unsurprisingly, Plaintiff disagrees, arguing broadly that (i) *Liu* does not affect, much less undermine, the Second Circuit's method of calculating profits; and (ii) certification of the issue to the Second Circuit would not speed the resolution of this litigation for several reasons. (Pl. Cert. Opp. 11-20). Given the posture of the parties' arguments, the Court first considers the caselaw establishing the method of calculating profits under Section 16(b), and the impact on that caselaw, if any, of the *Liu* decision, before addressing the statutory factors for certification.

### 1.    The Development of the Second Circuit's "Lowest Price In, Highest Price Out" Method of Determining Profits

In relevant part, Section 16(b) prescribes that:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, *any profit* realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) or a security-based swap agreement involving any such equity security within any period of less than six months, unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months.

15 U.S.C. § 78p(b) (emphasis added).  The statute does not specify the precise manner in which profits are to be calculated.

The "lowest price in, highest price out" method of determining Section 16(b) profits was first articulated by the Second Circuit in *Smolowe* v. *Delendo Corp.*, 136 F.2d 231 (2d Cir.), *cert. denied*, 320 U.S. 751 (1943).[4]  That case involved securities transactions by shareholders in the former Oldetyme Distillers Corp. between December 1939 and May 1940.  *See Smolowe* v. *Delendo Corp.*, 46 F. Supp. 758, 762 (S.D.N.Y. 1942).  In entering judgment after a bench trial, the district court had found, among other things, that

---

[4]     The version of Section 16(b) then in place was virtually identical, other than the omission of references to "security-based swap agreements."

(i) Section 16(b) did not require a showing of unfair use of inside information or similar bad faith; (ii) the provision was neither violative of due process rights nor "arbitrary and capricious"; and (iii) profits were determined by matching sales against "any other purchase at a lower price during the period," with no setoffs for losses. *Id.* at 762-66.

The Second Circuit affirmed. After agreeing with the district court that Section 16(b) did not require proof of unfair use, *see Smolowe*, 136 F.2d at 235-36, the panel turned to the method of computing profits. The Court considered the legislative history and the text of the provision, concluding that:

> Section 16(b) then appears simply as a statement that any profit from any contract to purchase and any contract to sell — or vice versa — any stock or similar security shall be recoverable by the corporate issuer. There is no express limitation in this language; its generality permits and points to the matching of purchases and sales followed below. The fact that purchases and sales may be thus coupled, regardless of the intent of the insider with respect to a particular purchase or a particular sale and without limitation to a specific stock certificate, points to an arbitrary matching to achieve the showing of a maximum profit. Thus, where an insider purchases one certificate and sells another, the purchase and sale may be connected, even though the insider contends that he is holding the purchased security for sale after six months.

*Id.* at 237 (footnote omitted).[5] In so doing, the Court expressly rejected certain other methods suggested by the defense, including (i) matching purchases and

---

[5]     *See also Smolowe*, 136 F.2d at 239:

> The statute is broadly remedial. Recovery runs not to the stockholder, but the corporation. *We must suppose that the statute was intended to be thoroughgoing, to squeeze all possible profits out of a stock transaction[ ], and thus to establish a standard so high as to prevent any conflict between the selfish interest of a fiduciary*

sales by identity of stock certificates; (ii) using a "first in, first out" method; (iii) limiting the "first in, first out" method to those securities purchased and sold during the relevant six-month period; and (iv) employing an average purchase price and an average sale price during the relevant period and using those as the base computation.  *Id.* at 237-39.[6]

Eight years later, the Second Circuit reaffirmed its commitment to *Smolowe*'s "lowest price in, highest price out" framework of calculating profits. In *Gratz* v. *Claughton*, 187 F.2d 46, 48 (2d Cir.), *cert. denied*, 341 U.S. 920 (1951), the Court re-assessed the various methods of calculating profit for Section 16(b) purposes, as well as the policies ostensibly vindicated by each. In an opinion authored by Chief Judge Learned Hand, the Court concluded:

> If one is seeking an equation of purchase and sale, one may take any sale as the minuend and look back for six months for a purchase at less price to match against it. On the other hand, if one is looking for an equation of sale and purchase, one may take the same sale and look forward for six months for any purchase at a lower price. Although obviously no transaction can figure in more than one equation, with that exception we can see no escape from what we have just said.  It is true that this means that no director, officer, or "beneficial owner" may safely buy and sell, or sell and buy, shares of stock in the company except at intervals of six months.  Whether that is too drastic a means of meeting the evil, we have not to decide; it is enough that we can

---

> *officer, director, or stockholder and the faithful performance of his duty.*  The only rule whereby all possible profits can be surely recovered is that of lowest price in, highest price out — within six months — as applied by the district court. We affirm it here, defendants having failed to suggest another more reasonable rule.

> *Id.* (emphasis added) (internal citations and footnote omitted).

[6]     The Second Circuit also considered and rejected various constitutional challenges to the statute.  *See Smolowe*, 136 F.3d at 239-41.  Because this portion of the analysis is not relevant to the instant motion, the Court omits it from this Opinion.

> find no other way to administer the statute.  Therefore, not only will [w]e follow *Smolowe* v. *Delendo Corporation*, *supra*, as a prec[ed]ent; but as *res integra* and after independent analysis we reassert its doctrine.

*Id.* at 52 (footnote omitted).

For nearly eighty years, the Second Circuit has adhered to the lowest-in, highest-out method of calculating profits in Section 16(b) cases.  *Accord, e.g.*, *Mayer* v. *Chesapeake Ins. Co.*, 877 F.2d 1154, 1164 (2d Cir. 1989), *superseded by statute on other grounds*, Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Release No. 34-28869, 56 Fed. Reg. 7242 (Feb. 21, 1991) (codified at 17 C.F.R. § 240.16a-1); *see also Analytical Survs., Inc.* v. *Tonga Partners, L.P.*, 684 F.3d 36, 50 (2d Cir. 2012), *as amended* (July 13, 2012) (employing *Smolowe* method in the context of hybrid derivative securities).[7]  The method is not without its critics, and, as noted, the authors of *Smolowe* and *Gratz* recognized that other options existed.[8]  But as the authors of a leading treatise on Section 16(b) have observed:

---

[7]     This approach has been uniformly adopted by other circuits and by the Securities and Exchange Commission (the "SEC").  *See, e.g.*, *Arrow Distrib. Corp.* v. *Baumgartner*, 783 F.2d 1274, 1278 (5th Cir. 1986); *Gund* v. *First Fla. Banks, Inc.*, 726 F.2d 682, 688 (11th Cir. 1984); *Whittaker* v. *Whittaker Corp.*, 639 F.2d 516, 530 (9th Cir. 1981), *abrogated on other grounds by Credit Suisse Sec. (USA) LLC* v. *Simmonds*, 566 U.S. 221 (2012); In Re Comm'n Guidance on Application of Certain Provisions of Sec. Act of 1933, Release Nos. 33-8107 and 34-46101, 2002 WL 1677437, at *4-10 (June 21, 2002) (discussing issues involving Section 16(b), including matching of transactions and calculation of profits; Interpretive Release on Rules Applicable to Insider Reporting & Trading, Release No. 34-18114, 46 Fed. Reg. 4817 (Sept. 24, 1981); *see also* Peter J. Romeo & Alan L. Dye, Section 16 Treatise And Reporting Guide § 12:02 at 1227 (5th Ed. 2019) (hereinafter, "Romeo & Dye") ("The courts have utilized the lowest-in, highest out approach almost exclusively when calculating profits under Section 16(b)[.]" (footnote omitted)).

[8]     *See also* Andrew Chin, *The Learned Hand Unformula for Short-Swing Liability*, 91 Wash. L. Rev. 1523, 1552-63 (2016) (presenting mathematical proof that the "lowest-in, highest-out" formula "correctly produces the maximum profit attributable to a sequence of transactions falling within a single statutory six-month period," while arguing that it

> The courts have justified the lowest-in, highest-out method by citing the "broadly remedial" purpose of the statute. The validity of this justification is open to debate, given the quasi punitive effect of the method and the existence of other remedies for insider trading violations not contemplated at the time Section 16(b) was enacted in 1934. Any such debate is, however, of purely academic interest. The undeniable fact is that the lowest-in, highest-out method is so firmly ingrained in the fabric of Section 16(b) that there is virtually no chance a court will deviate from it in the absence of a statutory or rule change to the contrary.

Romeo & Dye, *supra*, § 12.02 at 1236.

## 2. The Impact of the *Liu* Decision

The *Liu* case arose in a different context, although Defendants contend that its teachings are equally applicable to the Section 16(b) setting. The SEC brought a civil enforcement action under Section 17(a)(2) of the Securities Act of 1933[9] against a married couple, Charles Liu and Xin Wang, for their involvement in a scheme to defraud foreign nationals under the EB-5 Immigrant Investor Program. *See Liu*, 140 S. Ct. at 1941. According to the SEC, the pair had solicited nearly $27 million from foreign investors by means

---

is more prone to error in longer or more complex cases); Arnold S. Jacobs, *An Analysis of Section 16 of the Securities Exchange Act of 1934*, 32 N.Y. L. SCH. L. REV. 209, 532-33 (1987) ("The lowest price in-highest price out rule and the principle of obtaining the maximum possible profit ordinarily will result in the same profit determination, but they do vary under two circumstances. First, the profit determined under the two approaches need not be the same when the insider's trading takes place over more than six months.... A second instance in which the lowest price in-highest price out formulation cannot be used to obtain the maximum profit is when the statute of limitations precludes the use of some trades.").

[9] Section 17(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(2), makes it unlawful for any person in the offer or sale of any "securities" to obtain "money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

of a private offering memorandum, which touted that the funds would be used for the construction of a cancer-treatment center; in truth, the majority of the money was spent on "ostensible marketing expenses and salaries," or diverted to accounts under the pair's control, with only a fraction spent in accordance with the memorandum. *Id.* at 1941-42. After the district court found in favor of the SEC, it granted injunctive relief, imposed a civil penalty, and ordered "disgorgement equal to the full amount petitioners had raised from investors," less what remained in corporate accounts for the project, with no offset for legitimate business expenses. *Id.* at 1942.

The *Liu* petitioners focused on the Supreme Court's 2017 decision in *Kokesh* v. *SEC*, 581 U.S. —, 137 S. Ct. 1635 (2017), which found disgorgement to be a penalty for purposes of 28 U.S.C. § 2462, which establishes a five-year limitations period for "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture." From this, petitioners argued that disgorgement was not available to the SEC in enforcement actions in federal court, because (i) disgorgement was not specifically enumerated as a remedy in the Exchange Act, as it was in at least two other statutes delineating agency powers; and (ii) as a penalty, it was not part of the "equitable relief" that the SEC was permitted to seek under Section 21 of the Exchange Act, 15 U.S.C. § 78(u)(d)(5).[10] *See generally* Brief for Petitioners, *Liu* v. *SEC*, 140 S. Ct. 1936

---

[10]     *See* 15 U.S.C. § 78u(d)(5) ("In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.").

(2020) (No. 18-1501), 2019 WL 6977158.  For its part, the SEC argued that courts and Congress had, since the enactment of the securities laws, consistently permitted the SEC to obtain disgorgement as an equitable remedy ancillary to injunctive relief.  *See generally* Brief for the Respondent, *Liu* v. *SEC*, 140 S. Ct. 1936 (2020) (No. 18-1501), 2020 WL 257572.

The Supreme Court, in an opinion authored by Justice Sotomayor (who, incidentally, also authored *Kokesh*) began its analysis by identifying the issue left open in *Kokesh*: "whether, and to what extent, the SEC may seek 'disgorgement' in the first instance through its power to award 'equitable relief' under 15 U.S.C. § 78u(d)(5), a power that historically excludes punitive sanctions."  *Kokesh*, 140 S. Ct. at 1940.  To resolve the issue, the Court considered whether the remedy of disgorgement fell within "those categories of relief that were *typically* available in equity."  *Id.* at 1942 (citing *Mertens* v. *Hewitt Associates*, 508 U.S. 248, 256 (1993) (emphasis in *Mertens*)).  According to the Court:

> These works on equity jurisprudence reveal two principles.  First, equity practice long authorized courts to strip wrongdoers of their ill-gotten gains, with scholars and courts using various labels for the remedy.  Second, to avoid transforming an equitable remedy into a punitive sanction, courts restricted the remedy to an individual wrongdoer's net profits to be awarded for victims.

*Id.*  Emphasizing the point, the Court's historical analysis disclosed that "[e]quity courts have routinely deprived wrongdoers of their net profits from unlawful activity, even though that remedy may have gone by different names."  *Id.*

15

Ultimately, the Court found that Congress had "incorporat[ed] these longstanding equitable principles into § 78u(d)(5)," but in so doing had "prohibited the SEC from seeking an equitable remedy in excess of a defendant's net profits from wrongdoing."  140 S. Ct. at 1946.  What is more, the Court found that while the SEC may have "originally endeavored to conform its disgorgement remedy to the common-law limitations in § 78u(d)(5)," courts awarding disgorgement in more recent cases had strayed from the path "in three main ways that test the bounds of equity practice": (i) ordering the proceeds of fraud to be deposited in Treasury funds (instead of disbursing them to victims), (ii) imposing joint and several disgorgement liability, and (iii) declining to deduct legitimate expenses from the receipts of fraud.  *Id.* at 1946.

The Court explained that the parties' briefing had not adequately addressed whether the specific disgorgement award imposed on petitioners crossed the bounds of traditional equity practice, and thus did not decide that specific point.  140 S. Ct. at 1947.  It nonetheless offered guidance for the lower courts to consider on remand.  *Id.* at 1947-50.  On the specific issue of expenses, the Court recalled its earlier guidance that "[c]ourts may not enter disgorgement awards that exceed the gains 'made upon any business or investment, when both the receipts and payments are taken into the account.'" *Id.* at 1950 (quoting *Providence Rubber Co.* v. *Goodyear*, 76 U.S. 788, 794 (1869)).  In making such a determination, the Supreme Court admonished lower courts to distinguish legitimate expenses from those there were "merely

16

wrongful gains 'under another name.'" *Id.* (quoting *Goodyear*, 76 U.S. at 802). With that instruction, the case was remanded to the Ninth Circuit for further proceedings.[11]

### 3.     The Statutory Factors

Having considered the cases on which the parties' arguments are predicated, this Court now considers the three statutory factors for certification under Section 1292(b).

### a.     A Controlling Question of Law

"[A] question of law is 'controlling' if reversal of the district court's order would terminate the action." *Klinghoffer*, 921 F.2d at 24. A question of law can also be controlling if reversal of the district court's order "could significantly affect the conduct of the action," or if "the certified issue has precedential value for a large number of cases." *Glatt* v. *Fox Searchlight Pictures Inc.*, No. 11 Civ. 6784 (WHP), 2013 WL 5405696, at *2 (S.D.N.Y. Sept. 17, 2013) (quoting *Primavera Familienstifung* v. *Askin*, 139 F. Supp. 2d 567, 570 (S.D.N.Y. 2001)); *see also In re Duplan Corp.*, 591 F.2d 139, 148 n.11 (2d Cir. 1978) (noting that a question of law is "controlling" if it "may importantly affect the conduct of an action" (citing *Coopers & Lybrand* v.

---

[11]     On remand, the district court solicited briefing and argument from the parties concerning the appropriate disgorgement figure. (*See, e.g.*, Liu Dkt. #319-322, 324-325 (briefing), 328 (June 7, 2021 Order awarding disgorgement), 329 (transcript of hearing of June 7, 2021)). Thereafter, the court awarded disgorgement in the amount of $20,871,758.81, which reflected $26,423,168 that Liu and Wang raised from investors, less (i) $2,210,701 in administrative expenses, (ii) $3,105,809 in what the court determined to be legitimate business expenses, and (iii) $234,899.19 in funds remaining in Liu's and Wang's accounts. (*See* Liu Dkt #328 (June 7, 2021 Order awarding disgorgement), 336 (final judgment)). The matter is now on appeal to the Ninth Circuit. (*See* Liu Dkt #341 (notice of appeal)).

*Livesay*, 437 U.S. 463, 475 (1978)); *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 1997 WL 458739, at *4 (S.D.N.Y. Aug. 12, 1997) ("A controlling question of law exists if: [i] reversal of the district court's opinion could result in dismissal of the action, [ii] reversal of the district court's opinion, even though not resulting in dismissal, could significantly affect the conduct of the action, or [iii] the certified issue has precedential value for a large number of cases.").  Of note, the certified issue "must refer to a pure question of law that the reviewing court could decide quickly and cleanly without having to study the record." *Capitol Records, LLC* v. *Vimeo, LLC*, 972 F. Supp. 2d 537, 551 (S.D.N.Y. 2013) (internal quotation marks and citations omitted).

"[S]ection 1292(b) authorizes certification of orders for interlocutory appeal, not certification of questions." *Isra Fruit Ltd.* v. *Agrexco Agr. Exp. Co.*, 804 F.2d 24, 25 (2d Cir. 1986) (collecting cases), *cited in Pen Am. Ctr., Inc.* v. *Trump*, No. 18 Civ. 9433 (LGS), 2020 WL 5836419, at *2 (S.D.N.Y. Oct. 1, 2020).  That said, the Second Circuit has found it "helpful if the district judge frames the controlling question(s) that the judge believes is presented by the order being certified." *Isra Fruit Ltd.*, 804 F.2d at 25.  Defendants frame the controlling question as "whether, after *Liu*, plaintiffs in Section 16(b) actions may still recover disgorgement awards in excess of defendants' actual net gains from the at-issue trades" (Def. Cert. Reply 1), and the Court adopts that framing here.

Defendants argue that the issue as framed is a controlling question of law.  They reason first that an affirmative response from the Circuit would end the instant litigation, because: (i) even Plaintiff concedes that Defendants lost money on the transactions at issue (*id.* at 2-3 (citing Pl. Cert. Opp. 7 n.3)), and (ii) failure to plead profit on the transactions is fatal to a Section 16(b) claim (*id.* at 3 (citations omitted)).  Alternatively, Defendants contend that clarification of the issue from the Circuit would have "widespread precedential value for tens of thousands [of] statutory insiders subject to possible disgorgement actions under Section 16(b)."  (Def. Cert. Br. 1; *cf.* Def. Cert. Reply 2-3 n.2 (arguing that a question can be "controlling" even if it does not affect a wide range of pending cases)).

Working in reverse order, the Court finds that Defendants have not established the requisite precedential significance.  While Defendants cite the number of registrants under Section 12 of the Exchange Act — 5,975 as of 2018 (Def. Cert. Br. 6 (citing Romeo & Dye)) — and extrapolate from that number to "tens of thousands of statutory insiders subject to possible disgorgement actions under Section 16(b)" (*id.* at 7), the Court believes that analysis overstates the significance of any decision from the Second Circuit. For one thing, the Court's review of this District's docket indicates that fewer than twenty Section 16(b) cases have been filed in each of the past several years, suggesting that the precedential reach of any decision would be limited. It is true that the Court's analysis does not account for cases that were not filed because insiders conformed their conduct to what they understood to be

the law, and that certification might provide additional guidance to those insiders.  However, given the disinclination expressed in the caselaw for certification of orders under Section 1292(b), this Court does not believe that this case has enough reach to merit such extraordinary treatment.  Defendants have perhaps more traction with their first argument, in that resolution of the issue could be dispositive of Plaintiff's ability to bring a claim.  However, as discussed in the next section, Defendants' controlling question argument rises or falls — and, in this case, falls — on the second prong of the analysis.

> **b.   Substantial Ground for Difference of Opinion**

To demonstrate that there is a "substantial ground for difference of opinion," a defendant must identify "more than simple disagreement on the issue"; "[r]ather, the Court looks for conflicting authority on the issue and considers whether the issue is particularly difficult and of first impression for the Second Circuit." *Danaher Corp.* v. *Travels Indem. Co.*, No. 10 Civ. 121 (JPO), 2020 WL 6712193, at *1 (S.D.N.Y. Nov. 16, 2020) (internal quotation marks omitted).  "[T]he mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996). Similarly, "[m]ere conjecture that courts would disagree on the issue" is insufficient.  *Bellino* v. *JPMorgan Chase Bank, N.A.*, No. 14 Civ. 3139 (NSR), 2017 WL 129021, at *2 (S.D.N.Y. Jan. 13, 2017); *see also Tantaros* v. *Fox News Network, LLC.*, 465 F. Supp. 3d 385, 391 (S.D.N.Y. 2020) ("Courts have struggled with determining whether the difference of opinion as to a controlling

question of law is 'substantial' or 'merely metaphysical.'" (quoting *Am. Tel. & Tel. Co.* v. *N. Am. Indus. of New York, Inc.*, 783 F. Supp. 810, 814 (S.D.N.Y. 1992))).  Instead, "there must be substantial doubt that the district court's order was correct." *Century Pac., Inc.* v. *Hilton Hotels Corp.*, 574 F. Supp. 2d 369, 372 (S.D.N.Y. 2008) (quoting *SPL Shipping Ltd.* v. *Gujarat Cheminex Ltd.*, No. 06 Civ. 15375 (KMK), 2007 WL 1119753, at *2 (S.D.N.Y. Apr. 12, 2007)) (internal quotation marks omitted); *accord In re Kumtor Gold Co. CJSC*, No. 21 Civ. 6578 (AKH), 2021 WL 4926014, at *4 (S.D.N.Y. Oct. 20, 2021) ("[S]ubstantial grounds for difference of opinion must arise out of a genuine doubt as to the correct legal standard that was relied upon in the order [and] ... must involve more than strong disagreement between the adversary parties." (internal quotation marks omitted)).

In resolving Defendants' motion to dismiss, the Court observed that the *Liu* decision "is not easily imported into the Section 16(b) context."  (Dkt. #35 at 28).  In particular, the Court cited the facts that (i) Section 16(b) suits can be brought in both law and equity, and (ii) *Liu* focused on the SEC and not private litigants.  On further reflection, the Court reiterates both of those points, but acknowledges that they may not be dispositive of Defendants' argument.  A more apt response is that it is not obvious to the Court that *Liu* creates a conflict with the *Smolowe/Gratz* line of cases.  *Liu*, after all, was designed to stanch the bleeding, as it were, from *Kokesh*, and make clear that disgorgement remained a remedy available to the SEC in enforcement actions, even if it was not specifically mentioned in the Exchange Act.  By contrast, the

disgorgement of short-swing profits from insiders to issuers has been expressly included in Section 16(b) since its enactment.[12]  Similarly, the concerns expressed by the Supreme Court at the tail end of the *Liu* decision are not present in the Section 16(b) context, inasmuch as (i) the disgorged funds are returned to the issuer and not the public fisc; (ii) the law forecloses "double recovery," as, for example, in the event of concurrent violations of the securities laws; and (iii) expenses are netted out of the disgorgement figure.  *See generally Newmark* v. *RKO Gen., Inc.*, 425 F.2d 348, 351 (2d Cir. 1970) ("To maximize its deterrent effect, [Section 16(b)] is drafted in clear, straightforward terms.  It provides that whenever a director, officer or owner of ten percent or more of any class of an issuer's securities purchases and sells equity securities of that issuer within a six-month period, he must return any profits he realizes to the issuer.  There are no other prerequisites or postulates to liability."); *Litton Indus., Inc.* v. *Lehman Bros. Kuhn Loeb Inc.*, 734 F. Supp. 1071, 1076 (S.D.N.Y. 1990) ("Once ill-gotten profits have been disgorged to the SEC, further disgorgement as damages in a private action is clearly punitive in its effect and would constitute an impermissible penalty assessment."); *Herrmann* v. *Steinberg*, 812 F.2d 63, 65 n.3 (2d Cir. 1987) ("Expenses that are attendant to

---

[12]     To be sure, Section 16(b) does not use the word disgorgement.  However, courts interpreting the provision have generally used that term to describe the recovery of profits by the issuer.  *See, e.g.*, *Gollust* v. *Mendell*, 501 U.S. 115, 122 (1991) ("[Section 16(b)] imposes a form of strict liability on 'beneficial owner[s],' as well as on the issuer's officers and directors, rendering them liable to suits requiring them to disgorge their profits even if they did not trade on inside information or intend to profit on the basis of such information."); *accord Gwozdzinsky* v. *Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998); *Magma Power Co.* v. *Dow Chem. Co.*, 136 F.3d 316, 320 (2d Cir. 1998).

any purchase of shares and routinely included in the purchase price, such as transfer taxes and brokerage commissions, are considered incidental to the sale and thus deductible from short swing profits." (internal citation omitted)).

The real fight in this case, of course, is not over what constitutes proper disgorgement, but what constitutes "profits." Defendants asseverate that the transactions at issue, considered in sequence, resulted in losses. (Def. Cert. Br. 2; Def. Cert. Reply 2-5). Depending on the mode of calculation, they may be correct. The fact remains that courts have uniformly employed the lowest-in, highest-out method to capture the maximum profits possible, to make it easier for the courts and insiders to understand how profits are to be calculated, and to accord with the animating principles of the statute — all out of an overarching concern that to apply a different methodology would incentivize insiders to warehouse their securities and then structure their transactions. Indeed, the various methods of calculating profits suggested by the parties in their briefing have been specifically rejected by multiple courts. *See supra* at 8-13; *see also* Romeo & Dye, *supra*, at § 12.03 (listing rejected arguments for the calculation of or reductions to profits under Section 16(b)). This Court is not willing to recognize a "substantial ground for difference of opinion" with eighty years of precedent, based on a single Supreme Court case involving the SEC in a different procedural context, and with a different statute that contained a more amorphous reference to "equitable relief."

### c.   Material Advancement of the Ultimate Termination of the Litigation

To satisfy the third prong of Section 1292(b), a defendant must show that certification will "'materially advance the ultimate termination of the litigation,' which is satisfied if the interlocutory appeal 'promises to advance the time for trial or to shorten the time required for trial.'" *Giuffre* v. *Dershowitz*, No. 19 Civ. 3377 (LAP), 2021 WL 6052116, at *2 (S.D.N.Y. Dec. 21, 2021) (quoting *Youngers* v. *Virtus Inv. Partners Inc.*, 228 F. Supp. 3d 295, 302 (S.D.N.Y. 2017)). Courts place "particular weight" on this factor, *Transp. Workers Union of Am.*, 358 F. Supp. 2d at 350, and it is "closely connected" to the first factor, *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (RJH), 2012 WL 363118, at *2 (S.D.N.Y. Feb. 2, 2012). In considering this third factor, "courts must consider the institutional efficiency of both the district court and the appellate court." *Tocco* v. *Real Time Resolutions, Inc.*, No. 14 Civ. 810 (WHP), 2015 WL 5086390, at *2 (S.D.N.Y. Mar. 4, 2015); *see also In re Lloyd's Am. Trust Fund Litig.*, 1997 WL 458739, at *4 ("[T]he efficiency of both the district court and the appellate court are to be considered, and the benefit to the district court of avoiding unnecessary trial must be weighed against the inefficiency of having the Court of Appeals hear multiple appeals in the same case.").

It is unclear that certification of the issue identified by Defendants would materially advance the termination of this litigation. Defendants claim that a decision in their favor would end the litigation. (Def. Cert. Br. 11-12; Def. Cert. Reply 9-10). Plaintiff counters, however, that she would rely on the "*at law* or in equity" language of the statute and simply replead the case by replacing

references to "disgorgement" with references to "forfeiture" or "profits."  (Pl. Cert. Opp. 9-10).  The Court is skeptical that such efforts would suffice to transform the return of short-swing profits into something other than disgorgement, given the caselaw cited in note 12, *supra*, but agrees with Plaintiff that further motion practice of this type would extend the litigation. More persuasive are Plaintiff's arguments that Defendants' denunciation of the *Smolowe* method does not include a replacement, and that either of this Court or the Second Circuit would have to contend with constructing a post-*Liu* means of calculating profits in Section 16(b) cases.  (*See id.* at 17-20).  Here, too, the Court's lack of conviction that *Liu* compels such sweeping changes to the statutory regime causes it to conclude that certification would not result in Defendants' anticipated resolution of the case, and, accordingly, that certification is not warranted.

## CONCLUSION

For the reasons set forth in this Opinion, Defendants' motion to certify the July 8 Order for interlocutory appeal is DENIED.  The Clerk of Court is directed to terminate the motion at docket entry 37.  The Court will separately address Defendants' pending motion to stay this matter in light of Standard General's agreement to acquire TEGNA.  (Dkt. #49).

SO ORDERED.

Dated:     March 14, 2022
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge